**NATURAL RESOURCES DEFENSE COUNCIL, INC. et al., Plaintiffs,**

v.

**Curtis J. BERKLUND et al., Defendants,**

**and**

**Utah Power & Light Company et al., Intervening Defendants.**

**Civ. A. No. 75–0313.**

United States District Court, D. Columbia.

June 30, 1978.

Bruce J. Terris, Washington, D.C., for plaintiff.

Gerald S. Fish, Dept. of Justice, Washington, D.C., for defendants.

Gerry Levenberg, Washington, D.C., for intervening defendants, Utah Power and Light Co.

Christopher R. O'Neill, Washington, D.C., for intervening defendant, Chaco.

## OPINION

JUNE L. GREEN, District Judge.

### Introduction

Plaintiffs in this case are two environmental organizations, National Resources Defense Council (NRDC) and Environmental Defense Fund (EDF), who are suing on behalf of their members. Defendants are the Director of the Bureau of Land Management, the Secretary of the Interior, and the Director of the United States Geological Survey. Intervening defendants are Utah Power and Light Company and Chaco Energy Company.

Plaintiffs seek a declaratory judgment (1) that the Secretary has discretion under section 2 of the Mineral Leasing Act of 1920, 30 U.S.C. § 201(b),[1] and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq. to reject "preference right lease applications" on environmental grounds and (2) that the Secretary must prepare an environmental impact statement (EIS) on any proposed issuance of a preference right coal lease where the issuance would constitute major federal action significantly affecting the environment.[2] Plaintiffs further seek to enjoin defendants from issuing such leases without compliance with the aforementioned declaratory judgment.[3]

Defendants challenge plaintiffs' complaint on a number of jurisdictional grounds, and with the intervenors, maintain that the language of § 201(b) mandates the Secretary to issue a preference right lease if the permittee finds coal in "commercial quantities." Defendants further claim that NEPA grants the Secretary broad discretion in setting lease terms but gives him no added discretion to reject a lease on purely environmental grounds once the requirement of commercial quantities has been met. Accordingly, they argue an EIS should be prepared on the proposed lease terms, not on the proposed issuance of the lease.

This case is before the Court on cross-motions for summary judgment. Upon consideration of the full record herein and for the reasons set forth below, the Court finds that under 30 U.S.C. § 201(b) the Secretary of the Interior does not have discretion to reject preference right coal leases where coal has been found in commercial quantities. However, where the issuance would constitute a major federal action significantly affecting the environment, the Sec-

1. 30 U.S.C. § 201(b) states:

"(b) Where prospecting or exploratory work is necessary to determine the existence of workability of coal deposits in any unclaimed, undeveloped area, the Secretary of the Interior may issue, to applicants qualified under this chapter, prospecting permits for a term of two years, for not exceeding five thousand one hundred and twenty acres; and if within said period of two years thereafter the permittee shows to the Secretary that the land contains coal in commercial quantities, the permittee shall be entitled to a lease under this chapter for all or part of the land in his permit."

2. Plaintiffs claim that the Secretary must consider the environmentally related costs in deciding whether "commercial quantities" have been discovered was mooted by the Department's promulgation of regulations on May 7, 1976, which substantially complies with plaintiffs' request.

3. In NRDC v. Hughes, 437 F.Supp. 981 (D.D.C. 1977), Judge John H. Pratt granted a temporary restraining order enjoining defendants from issuing preference right leases pending preparation of an adequate coal programmatic environmental impact statement.

retary is enjoined from issuing said lease unless he first prepares an appropriate EIS.

### Factual Background

I. Past and Current Procedures for Issuing Prospecting Permits and Preference Rights Leases

Section 2 of the Mineral Leasing Act of 1920, 30 U.S.C. § 201, governs the issuance of coal leases and prospecting permits. Section 201(a) [4] authorizes the Secretary to lease federal coal reserves by competitive bidding or such other methods as he may adopt. Section 201(b) [5] authorizes the Secretary to issue prospecting permits and so-called "preference right" leases where prospecting or exploration is necessary to determine the existence of coal. The Department of Interior, throughout the 58 years of administration of these provisions, has consistently interpreted § 201(b) as giving the Secretary discretion in the granting of the prospecting permits, but as denying him discretion to reject a preference right lease once a permit has issued and coal in commercial quantities has been found.

Although the Secretary retained discretion in the granting of prospecting permits, until 1969 permits were issued routinely upon request where consistent with the law. Upon receipt of an application for a coal prospecting permit, the Bureau of Land Management (BLM) referred it to the United States Geological Survey (USGS), the agency responsible for making the geologic, economic and other technical judgment, for a determination whether sufficient information was known about the area to warrant offering the area for a competitive lease sale. If the USGS determined that sufficient information was not available, it notified the BLM that issuance of a prospecting permit was appropriate. Environ-

mental consequences of issuing these permits were not examined or considered.

After the prospecting permit was issued, and if the permittee submitted an application for a preference right lease, the BLM again referred the lease application to USGS for a determination of whether the permittee had demonstrated that the land contained commercial quantities of coal. Determination of commercial quantities was based solely on whether the coal existed, its character and heat-giving quality, and whether it could be physically extracted at a profit without regard to environmental impact or costs. Consistent with defendants' interpretation of § 201(b), if the USGS determined that commercial quantities of coal had been found, the lease was issued automatically to the applicant. The lessee could then extract the federal coal deposits specified in the lease pursuant to applicable laws, regulations and stipulations in the lease itself.

Regulations promulgated by the Department of Interior on January 18, 1969 introduced requirements for a technical examination prior to the issuance of a permit or a lease as well as approval of a mining plan prior to actual mining operations. These requirements substantially broadened the Secretary's authority to assess and mitigate against environmental hazards. Specifically, the BLM, together with the USGS, were required to prepare a "technical examination" prior to the issuance of a permit or lease which would include a review of the prospective environmental impact of the application's proposed prospecting or mining operation. 43 C.F.R. § 23.5(a)(1). The technical examination was then used to formulate general permit or lease requirements for the protection of nonmineral resources and for reclamation. 43 C.F.R.

---

4. 30 U.S.C. § 201(a) states:

 "(a) The Secretary of the Interior is authorized to divide any of the coal lands or the deposits of coal, classified and unclassified, owned by the United States, into leasing tracts of forty acres each, or multiples thereof, and in such form as, in his opinion, will permit the most economical mining of the coal in such tracts, and thereafter he shall, in

his discretion, upon the request of any qualified applicant or on his own motion, from time to time, offer such lands or deposits of coal for leasing, and shall award leases thereon by competitive bidding or by such other methods as he may by general regulations adopt, to any qualified applicant. . . . ."

5. See note 1, *supra*.

§ 23.5(a)(2)(b). After the issuance of the permit or lease but before any prospecting or mining could commence, an exploration or mining plan was to be approved by defendants. 43 C.F.R. §§ 23.7 and 23.8. Significantly, the Secretary maintained and continues to maintain that the regulations allow him to reject the mining plan if it is found to be environmentally unsatisfactory or unacceptable. 43 C.F.R. § 23.8(a)(1).

The effect of these regulations was to guarantee that after 1969 no new prospecting permits would be issued without consideration being given to the environment.[6] More importantly, after 1969 all preference right lease applications, regardless of the date of issuance of the underlying permit, would be subject to an environmental scrutiny which would first determine the setting of lease terms to mitigate against environmental damage and later affect the decision whether to approve the proposed mining plan.[7]

By order # 2952 dated February 13, 1973, the Secretary announced a moratorium on the issuance of any prospecting permits for coal pursuant to the 1920 Act until further notice. All pending applications for such permits would be rejected "in order to allow the preparation of a program for the more orderly development of coal resources upon the public lands . . . with proper regard for the protection of the environment." Accordingly, since February 13, 1973, no new prospecting permits have been issued.[8] This moratorium did not apply to, or restrict the rights of, holders of outstanding prospecting permits to obtain preference right coal leases. Defendants' policy of conditioning acceptance or rejection of a preference right lease application

solely upon a discovery of coal in commercial quantities remained unchanged.

On May 6, 1976, in conjunction with the implementation of a comprehensive new coal leasing policy, defendants issued regulations which redefined the statutory terms "commercial quantities" and substantially altered the procedures for obtaining preference right leases.

The new regulations state that a person has found coal in commercial quantities when the deposit is ". . . of such a character and quantity that a prudent person would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine." 43 C.F.R. § 3520.1-1(c). The permittee must present evidence which shows that he reasonably expects his revenues to exceed his development and operating costs. Under the new regulations, however, these development and operating costs will include the cost of "complying with existing governmental regulations, reclamation and environmental standards, and proposed lease terms." 43 C.F.R. § 3521.1-1(c)(2)(vi).

The evidence which the permittee must submit as part of his commercial quantities test consists of both an "initial showing" and a "final showing." The permittee must make an "initial showing" describing in his preference right lease application both the proposed mining operations and the measures to be taken for reclamation and protection of the environment. 43 C.F.R. § 3521.-1-1(b). Defendants next conduct a "technical examination and environmental analysis" which includes an analysis of the environmental impact of the proposed mining operations. 43 C.F.R. § 3521-4. Drawing

---

6. The regulations state that they apply only to permits and leases issued after January 18, 1969. They do not apply to permits and leases of federal coal on lands where the federal government does not own the surface. 43 C.F.R. § 23.2(b)(d).

7. The Department, however, made no commitment to do an EIS if major federal action were involved. As of 1975, the Department had never done an EIS on a specific preference right lease application.

8. In 1976, Congress repealed 30 U.S.C. § 201(b) granting permits and preference right leases "subject to valid existing rights." Federal Coal Leasing Amendments Act of 1975, Pub.L. 94–377, 90 Stat. 1085 (1976). Section 4 of this Act eliminates the prior system of prospecting permits and preference rights leases and in turn provides for the issuance of exploration licenses, which do not give the licensee any right to the subsequent issuance of a coal mining lease.

on information contained in the technical examination and environmental analysis, the defendants then determine lease terms which may include rentals and royalty payments as well as conditions for mitigation of environmental damage. The mitigating lease terms are those required by related surface management regulations,[9] or more stringent terms may be set at the discretion of the Secretary. 43 C.F.R. § 3521.1–5(a). These proposed lease terms are reported to the permittee in the "technical examination and environmental analysis report." After receipt of the report, the permittee presents his final showing and submits a comparison of the estimates of his revenues and costs, including the costs of complying with applicable statutes, regulations and lease terms. 43 C.F.R. § 3521.1–1(c). If the estimates are based on a reasonable factual basis and support the permittee's assertion that he has found coal in commercial quantities, the Secretary will issue the lease. The requirement that the lessee later submit a mining plan continues in expanded form under 43 C.F.R. § 3041.[10]

Defendants admit that under these regulations, if there is a major federal action, an EIS might be required on the proposed lease terms prior to the issuance of the lease and on the approval of a mining plan after the issuance of the lease. These regulations do not, however, alter the Department's unbroken interpretation of the Mineral Leasing Act, that upon a finding of commercial quantities, the Secretary has no discretion to reject the lease.[11] Therefore, defendants will not prepare an EIS on the issuance of the lease, whether or not such issuance is a major federal action significantly affecting the environment.

## II. Federal Coal Management Facts Concerning Outstanding Prospecting Permits and Preference Right Lease Applications

For 40 years following the passage of the Mineral Leasing Act in 1920, the federal coal leasing program was relatively small. After 1960, however, there was an enormous surge in the issuance of federal coal prospecting permits and leases, as industrial and speculative interest in federal coal deposits boomed. Sixty-four percent of all outstanding federal coal leases were issued between 1960 and 1970. As a result, in 1970, there were nearly four times the number of acres under lease as there had been in 1960. The experience with prospecting permits was the same. Of 183 prospecting permits, which have matured into preference right lease applications, 90 were issued between February 1, 1965 and January 1, 1972.

Although the Department of Interior has not compiled figures to show the amount of land in the United States covered by currently outstanding prospecting permits and preference right lease applications, partial figures demonstrate that as of October 1974, in six western states, at least 496,000 acres containing some 12 billion tons of coal were subject to 183 preference right lease applications.[12] Much of this coal is minable by strip and surface mining methods. De-

---

9. The related regulations are found at 43 C.F.R. § 3041, enacted on June 8, 1976.

10. Congress has recently enacted the Federal Surface Mining Control and Reclamation Act of 1977. Pub.L. 95–87, 30 U.S.C. §§ 1201, 1251 et seq. This Act will not allow any surface mining, or underground mining because of its surface effects, without prior issuance of mining permits. It further requires extensive mitigation of environmental damage and specifically, in § 510(b)(4), sets out comprehensive requirements for designating lands as unsuitable for the surface mining of coal.

11. The Department today continues to adhere to this interpretation of 30 U.S.C. § 201(b)

despite a memorandum from the President dated May 23, 1977 instructing the Department of the Interior to "scrutinize existing federal coal leases (and applications for preference right leases) . . . taking steps as necessary to deal with environmentally unsatisfactory leases and applications, such as . . . reassessment of the basis for granting or denying preference right leases.

12. As of January 1975, in four western states, there were still some 100,812 acres subject to outstanding prospecting permits, any or all of which could mature into preference right lease applications.

fendants state in their papers that many of the permits upon which these applications are based were issued without the type of environmental scrutiny that would be standard today,[13] and some of these lease applications may cover leases where mining will not be acceptable.

While not all leases issued in the past have resulted in active coal mining operations, in 1976 Congress amended the Mineral Leasing Act to require lessees to diligently develop mining operations upon penalty of forfeiture. 30 U.S.C. § 207(a) as amended by Pub.L. 94–377. Approval of preference right lease applications, therefore, could potentially result in coal mining activities being undertaken on hundreds of thousands of acres of federal and private lands. Such mining operations could have an adverse environmental impact on the land containing federal coal deposits and on surrounding acreage.

### Jurisdiction

### I. Standing

■ Plaintiffs are two associations suing on behalf of their members, a "considerable number" of whom "use and enjoy the land, air, water, historic, archeological and aesthetic resources of the public lands administered by the defendants herein, some of which are subject to preference right coal lease applications."[14] Other members of the two associations "live in geographical areas which may be adversely affected by the development and urbanization attendant to the mining of federal coal lands pursuant to preference right coal leases."[15] These uncontroverted factual statements by the respective heads of NRDC and EDF are sufficient to support standing to sue. *Sierra Club et al. v. Andrus*, 188 U.S.App.D.C. ——, ——, 581 F.2d 895, 899 (1978); *Sierra Club v. Morton*, 169 U.S.App.D.C. 20, 24, 514 F.2d 856, 870 n.20 (1975).

### II. Ripeness and Case or Controversy

■ Defendants, in their initial motion for summary judgment, on August 25, 1975, urge the Court to dismiss the case because it is not ripe for decision. According to defendants, the record "plainly establishes" that the phrase "shall be entitled" in § 201(b) has not been defined by rule or regulation. The Secretary, however, affirmatively stated in a letter to plaintiffs that it is the consistent policy of the Department to interpret § 201(b) as mandating issuance of a preference right coal lease upon a showing that the coal exists in commercial quantities. The interpretation of § 201(b) embodied in defendant Berklund's letter of January 13, 1975, is reviewable final agency action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *National Automatic Laundry & Cleaning Council v. Schultz*, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971).

Defendants' related argument that there is no present case or controversy and plaintiffs are seeking, in reality, an advisory opinion must also fail. Defendants in their memorandum dated January 17, 1977 adequately state the reasons why this case is ripe for adjudication: "The proposition that the Secretary has discretion to deny a lease notwithstanding a permittee's showing of coal in 'commercial quantities' constitutes the central theme of plaintiffs' argument . . . It is no less clear that defendants deny the existence of such discretionary authority in the Secretary. If the Court does not rule clearly and unequivocally that the Secretary has, or does not have, the discretion envisioned by plaintiffs, it will have failed to resolve the one point of dispute which clearly exists between plaintiffs and defendants."

13. Many of the preference right leases in this case arise out of prospecting permits which were issued prior to January 18, 1969, when the Department of the Interior first adopted regulations requiring technical examinations. For example, defendants' exhibit VIII attached to their motion for summary judgment lists 90 prospecting permits, of which 49 were entered into between February 1965 and January 18, 1969.

14. Affidavit of John H. Adams, ¶ 5.

15. Affidavit of Arlie Schandt, ¶ 5.

### III. Amount in Controversy [16]

In determining the amount in controversy, the United States Court of Appeals for the District of Columbia looks to "the pecuniary result to either party which the judgment would produce." *Gomez v. Wilson*, 155 U.S.App.D.C. 242, 251, 477 F.2d 411, 420, n.53 (1973). In light of the cost to the United States in preparing impact statements, and in losing income from coal lease contracts which otherwise would have been entered into, it is difficult to understand why defendants have even attempted to raise this issue. Since the results of a judgment favorable to plaintiffs could result in a cost to defendants exceeding $10,-000, the Court finds that the jurisdictional amount requirement has been satisfied.

### IV. Indispensable Parties

The parties agree that at least 183 applicants for preference right coal leases will be affected in some way by a judgment. The defendants press the Court to dismiss for failure to join these applicants as indispensable parties under Rule 19, Fed.R.Civ.P. While plaintiffs make no showing or representation, it can be assumed that these applicants reside in a multitude of states and cannot feasibly be joined in any one district. To require dismissal of this action which seeks to enforce what are essentially public rights, based upon a failure to join indispensable parties, would effectively preclude such litigation against the government. Rule 19 was not intended to cause such a result, and courts have not permitted it to do so.

The Supreme Court has long recognized the inapplicability of the term " 'indispensable party' to adjudications of public, not private rights." *National Licorice Co. v. NLRB*, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940). In that case, the Court held that when litigation seeks the vindication of a public right, third persons who may be adversely affected by a decision favorable to the plaintiff do not thereby become indispensable parties. The instant case presents a situation somewhere between purely private and public litigation, since the plaintiffs, private litigants, are seeking to vindicate the public rights embodied in NEPA. Such litigation would fall within the *National Licorice* rule, and other courts have so held. *See Kirkland v. New York State Dept. of Correctional Serv.*, 520 F.2d 420, 424 (2d Cir. 1975); *State of Delaware v. Bender*, 370 F.Supp. 1193, 1197–98 (D.Del. 1974). The 183 preference lease applicants are, therefore, not indispensable parties within the scope of Rule 19, and their absence does not defeat the Court's jurisdiction to decide the issues before it.

### Merits

I. Does Either the Mineral Leasing Act of 1920 or NEPA Give the Secretary Discretion to Reject a Preference Right Coal Lease Application on Purely Environmental Grounds?

Plaintiffs contend that the Secretary has discretion under 30 U.S.C. § 201(b) and NEPA to reject a preference right lease application on purely environmental grounds. They rest their contention primarily on two premises. First, the language of the Mineral Leasing Act authorizes rejection and, second, NEPA requires that the Mineral Leasing Act be interpreted to further NEPA's broad policies of environmental protection.

An analysis of the language in §§ 201(a) and 201(b) does not support plaintiffs' statutory interpretation. Under § 201(a), where lands are known to contain coal deposits, the Secretary "shall, in his discretion," offer the lands for lease by

16. 28 U.S.C. § 1331 was recently amended by Congress to eliminate the $10,000 amount in controversy requirement in civil actions "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub.L.No.94–574 § 2, 90 Stat. 2721 (1976). However, this suit was filed prior to the amendment, and federal jurisdiction is to "be measured according to the provisions of § 1331 as it stood when the complaint was filed." *Planning Research Corp. v. FPC*, 181 U.S.App.D.C. 33, 39, 555 F.2d 970, 976, n.10 (1977); *Sears, Roebuck & Co. v. General Services Administration*, 180 U.S.App.D.C. 202, 204, 553 F.2d 1378, 1380, n.6 (1977).

competitive bidding "or by such other methods as he may by general regulations adopt." If, however, the existence or workability of deposits is unknown, under § 201(b) the Secretary "*may* issue" prospecting permits. If the permittee then makes a showing that the land contains commercial quantities, the permittee "*shall* be entitled" to a lease. The language "shall be entitled" could not be clearer, and on its face it obligates the Secretary to issue a coal lease to the permittee.

Plaintiffs argue that the § 201(b) procedure must be interpreted as one of the "other methods" open to the Secretary under § 201(a) for issuance of leases. This would inject the discretion granted the Secretary by § 201(a) into the procedure of § 201(b), thereby requiring him to comply with NEPA when proceeding under § 201(b). Plaintiffs' interpretation is incorrect. The other methods referred to in § 201(a) are those to be adopted by the Secretary by regulation, not those methods already provided for by the statute.

Plaintiffs next point to the legislative history, which they claim implies a different meaning. The House Report states that § 201(b) was intended:

> "to encourage the prospecting of undiscovered coal deposits and to reward the prospector by giving him a preferential right to a lease of the area covered by his permit." H.R.No.398, 66th Cong., 1st Sess. 12 (1919).

Use of the word "preferential," according to plaintiffs, demonstrates that Congress intended only that the prospecting permittee be given a right of first refusal if the Secretary decided to lease the land at all.

■ The word "preferential" was not used in § 201(b), and in the absence of anything more, this would raise an ambiguity. However, Congress was aware of the difference between the phrases "preference right" and "shall be entitled," for it expressly granted "preference rights" to at least three other groups under different sections of the Mineral Leasing Act. *See* § 193a (granting "preference right" to United States to purchase products mined under the Act); § 229 (granting "preference right" to a permit or lease of mineral rights to entrymen or patentees of land entered and patented for agricultural purposes prior to the Act); § 262 (granting "preference right" to lessee of sodium rights to land to renew lease for successive periods of ten years). On the other hand, with the exception of oil and gas leases, Congress stated that prospecting permittees of other minerals "shall be entitled" to a lease of part or all of the lands prospected upon a showing of "commercial quantities" or "valuable deposits." *See* §§ 201(b) (coal), 211(b) (phosphates), 262 (sodium), 272 (sulphur), 282 (potash). The House Report did not intend to use "preferential right" as a term of art, and the weight accorded its use by plaintiffs must be rejected.

Plaintiffs also rely on *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) and *Duesing v. Udall*, 121 U.S.App.D.C. 370, 350 F.2d 748 (1965), *cert. denied*, 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966), which interpret § 226 of the Act pertaining to issuance of oil and gas leases to grant discretion to the Secretary to lease or not to lease. Section 226 is not identical to §§ 201(a) and (b), however. Section 226(a) states that the Secretary "may" lease all lands "known *or* believed to contain oil or gas deposits." Section 226(b), then, requires that land within a known producing oil or gas field shall be leased to the highest bidder, and § 226(c) requires that land not within a known producing oil or gas field shall be leased to the first qualified lease applicant. Both §§ 226(b) and (c) are subject to § 226(a), which grants general discretion to the Secretary to lease known oil and gas fields or land believed to be an oil and gas field, and the Court of Appeals so held. *Id.* at 750.

■ Not only is there a difference in the statutory language between these two sections of the Mineral Leasing Act, but the interpretation of the gas and oil provisions in *Udall v. Tallman, supra,* is inapplicable to coal preference right leases for two additional reasons. First, an oil and gas applicant does no more than file an application.

Congress, therefore, did not need to reward him, as it did the coal permittee, for his effort in discovering a previously undiscovered mineral. Second, there is no opportunity for the Secretary to exercise his discretion whether to release certain lands prior to an application for an oil or gas lease. In contrast, under the provisions pertaining to coal preference right leases, the Secretary exercises discretion and considers the public interest prior to issuing prospecting permits.

Furthermore, *Udall v. Tallman, supra,* requires this Court to respect an agency's interpretation of its statutory discretion. *See Brannan v. Stark,* 87 U.S.App.D.C. 388, 185 F.2d 871 (1950), *aff'd,* 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1951). Since the enactment of the Mineral Leasing Act in 1920, the Department has never wavered in its interpretation of the mandatory language of § 201(b).

Given the unequivocal statutory language and the supporting legislative history, as well as 58 years of consistent agency statutory interpretation and application, the court finds that "shall" does in fact mean "shall" and does not permit the Secretary to reject preference right coal leases on purely environmental grounds.

■ Alternatively, plaintiffs contend that the intent of § 201(b) is unclear and NEPA requires the Secretary to interpret his statutory mandate in accord with NEPA's broad environmental goals. The Court, however, finds nothing ambiguous in the words "shall be entitled"; the language is a clear mandate to the Secretary to award a preference right lease to a permittee who has made the requisite statutory showing. The question becomes, then, does NEPA require that the Secretary exercise discretion to reject a preference right lease on purely environmental grounds in violation of his express statutory obligation?

NEPA represents the most comprehensive legislative attempt yet to render the federal government responsive to broad environmental needs and considerations. Recognizing "the profound impact of man's activity on the interrelations of all compo-nents of the natural environment," including "resource exploitation", and further recognizing "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," Congress has required all federal agencies to administer their programs in accordance with the policies of NEPA. 42 U.S.C. §§ 4331, 4332. To this end, Congress directed that:

> *"to the fullest extent possible* : (1) the policies, regulations and public laws of the United States should be *interpreted* and *administered* in accordance with the policies [of NEPA] . . ." [emphasis supplied]. 42 U.S.C. § 4332.

■ A federal official, however, need not comply with NEPA where to do so would violate a statutory obligation. Legislative history indicates that compliance is mandated "unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible." Conf.Rept. 91–765, 91st Cong., 1st Sess., *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. 2767, 2770. In the Statement accompanying and made part of the Conference Report, the conferees observed that compliance was required "unless to do so would clearly violate . . . existing statutory authorizations." 115 Cong.Rec. 39703 (1969). Finally, the guidelines of the Council on Environmental Quality set forth that NEPA supplements existing obligations "unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible." 40 C.F.R. § 1500.4.

Moreover, in *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma,* 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976), the Supreme Court held:

> "Section 102 of [of NEPA] recognizes, however, that where a clear and unavoidable conflict in statutory authority exists, NEPA must give way. As we noted in *United States v. SCRAP,* 412 U.S. 669 [93 S.Ct. 2405, 2419, 37 L.Ed.2d 254], 'NEPA was not intended to repeal by implication any other statute.' "

Plaintiffs, however, cite *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971), as an example of how NEPA changed the statutory role of an agency. In *Calvert Cliffs'*, the Court was presented with a challenge to the adequacy of the AEC's regulations passed pursuant to NEPA. Although the First Circuit in *State of New Hampshire v. Atomic Energy Commission*, 406 F.2d 170 (1st Cir. 1969), *cert. denied*, 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969) held earlier that the AEC's statutory mandate was to consider only the radiological hazards its actions caused, the Circuit Court for the District of Columbia held that the subsequent passage of NEPA compelled the AEC to undertake consideration of environmental factors beyond radiation.

▮ *Calvert Cliffs'* is inapplicable to the case at bar for two reasons. First, the AEC's enabling statute did not *require* the AEC to grant a license if no radiation hazards were found. 42 U.S.C. § 2133(a). It merely restricted the consideration of factors which could preclude licensing to radioactivity. In the instant case, if the Secretary verifies a permittee's showing of commercial quantities, under the language of the statute, the Secretary is *obligated* to issue the lease. NEPA will not be applied to make discretionary an action which was mandatory before its enactment. *Union Oil Co. of California v. Morton*, 512 F.2d 743 (9th Cir. 1975). Second, the *Calvert Cliffs'* decision could be reached only because the applicant had not acquired any cognizable rights. Here, the lease applicant has acquired rights that must be recognized. NEPA cannot operate to remove those rights. *Jones v. Lynn*, 477 F.2d 885 (1st Cir. 1973).

In the absence of legislative history or case law to support plaintiffs' position that NEPA grants discretion to the Secretary,

the Court must turn to the policy considerations plaintiffs have presented. Plaintiffs emphasize that many of the preference right lease applications have matured from permits which were granted automatically, without any consideration given to the potential irreparable damage that mining operations could inflict on the environment. Plaintiffs' examples include damage to wildlife, vegetation, air and water quality, adverse effects on land-related resources such as archeological and historical sites, and the social costs of rapid population growth. They further express a concern that the rehabilitation of federal lands in the arid or semi-arid West is still in the experimental stage.

▮ Although this Court is greatly concerned that we manage our public lands to avoid irreparable damage to our environment and that we do not allow short-sighted decisions of yesterday to encumber future generations with ruined or depleted land resources, it cannot read discretion into a statute where there is none. Defendants still retain adequate means to protect our environment. As they readily concede, NEPA mandates that broad discretion be exercised in the setting of lease terms to prevent mining where reclamation is not attainable and to protect air, water quality and wildlife.[17] Moreover, because the cost of compliance with these lease terms will decide whether the permittee meets the commercial quantities requirement, it is the setting of the lease conditions which is crucial to the determination of whether or not the lease will issue.

Plaintiffs' concern that the Secretary will be forced to issue a lease where the social and environmental costs of coal mining far outweigh the benefit is without basis. NEPA requires the Secretary to determine particularized lease terms for land reclamation and air, water and wildlife protection,

---

17. The Secretary's broad authority to set lease terms to prevent environmental harm derives from NEPA and the Mineral Leasing Act. The Act directs the Secretary to set lease terms ". . . for the protection of the interests of the United States and . . . for the safe-

guarding of the public welfare." 30 U.S.C. § 187. This language must now be interpreted in light of NEPA's stated goals and be administered "to the fullest extent possible" according to NEPA's required procedures.

specifying, if necessary, areas which cannot be mined.[18] It also directs the Secretary to consider "unquantified environmental . . values." 42 U.S.C. § 4332(2)(B). Thus, the permittee could be required to conduct his mining operation in such a way as to minimize the socio-economic and cultural costs of rapid industrialization and urbanization.

 Furthermore, the Secretary has the discretion to incorporate general standards into the lease which are aimed at ameliorating environmental damage but which may not be susceptible to valuation as costs to the permittee. Reclamation of an arid area or protection of an endangered species might not be feasible under present technology. In such instance, the environmental damage which might occasion the Secretary to reject the lease is proscribed under the performance standards of the lease. If the permittee does not have the technological capability to comply with such standards, the high cost of compliance will outweigh potential coal revenues and he will fail the commercial quantities test. Until the permittee develops the necessary technology on a cost effective basis, he will be unable to make the requisite statutory showing and will not receive the lease.[19]

 The Secretary also has the discretion to adopt procedures for the setting of lease terms which will maximize his discretion and allow for extensive protection and safeguarding of the environment. Depending on the likelihood of environmental damage, he may choose either general performance lease standards which require mitigation, if not elimination of social, aesthetic and land resource costs to society, 43 C.F.R. § 3041.2–2, or more stringent lease requirements which will prescribe the detailed methods for mitigation of exceptional and special environmental harms. 43 C.F.R. § 3041.1(e). In either instance, he may propose to the permittee alternative lease requirements and ask the permittee to include in his final showing an analysis of the effectiveness and cost of compliance for each alternative requirement. In this way, the Secretary can benefit from the permittee's greater knowledge of current technology and his assessment of the cost and effectiveness of such technology prior to his final decision on the setting of the lease terms.

 In sum, although NEPA does not give the Secretary authority to reject a lease on purely environmental grounds, it does direct him to exercise his authority to safeguard society and prevent irreparable damage to the environment through a careful and complete formulation of lease terms.

II. Does NEPA Require the Secretary to Prepare an Environmental Impact Statement on any Proposed Issuance of a Preference Right Coal Lease?

Although neither NEPA nor the Mineral Leasing Act itself gives the Secretary discretion to reject preference right coal leases on environmental grounds alone, the question remains whether NEPA requires the Secretary to prepare an EIS pursuant to 42 U.S.C. § 4332(2)(C) on a proposed issuance of a preference right lease.[20]

Defendants contend that NEPA's provisions become operative only when the Secretary exercises his discretion. Accordingly, because the Secretary has no discretion to reject a preference right lease once commercial quantities are shown, he has no duty to prepare an EIS on the issuance of

---

**18.** 43 C.F.R. § 2521.1–5(a)(1) specifically requires the environmental analysis report to indicate "land where reclamation is not attainable or assured."

**19.** The comment to proposed regulations on commercial quantities states: "It is possible that stipulations to comply with the Endangered Species Act could result in a lease term application not meeting the requisite [commercial quantities] test. The lease would then be denied under the Mineral Leasing Act." 41 Fed.Reg. 18845 (1970).

**20.** Plaintiffs' contention that an EIS must be done adopts NEPA's qualification that the proposed action must be a "major federal action significantly affecting the quality of the human environment." For the remainder of the discussion when the Court addresses the issue of preparation of an EIS, it assumes that there is the requisite major federal action.

the lease. Instead, they maintain an EIS is required in relation to the proposed lease terms *prior* to the issuance of the lease, and in relation to the proposed mining plan *after* the issuance of the lease. Intervenors further insist no EIS should be done prior to the issuance of the lease. Instead, it should be prepared at the mining plan approval stage when the accumulation of additional data will allow for a meaningful examination of the environmental consequences.

■ The EIS with its notice and comment provisions is intended to investigate all alternatives to the proposed action as an aid and catalyst to the Secretary in his decision-making. As the Court in *Calvert Cliffs' Coordinating Committee v. AEC, supra*, states:

"[The EIS] seeks to insure that each agency decision-maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. . . . Moreover, by compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision-making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own." 146 U.S.App.D.C. at 38, 449 F.2d at 1114.

■ Prior to the final issuance of the lease, the Secretary must choose between three realistic courses of action, any one of which will either directly or indirectly determine whether a lease will issue. These alternative courses of action should, therefore, be analyzed according to NEPA procedures.

First, he must determine whether to initiate an exchange of lands for a mineral lease of comparable value or for coal bidding rights. 42 Fed.Reg. 6436 (1977). Second, as discussed earlier, he is required by NEPA to protect against irreparable environmental damage by the determination of lease terms. The setting of the lease terms will determine whether the permittee will meet the commercial quantities requirement which will, in turn, determine whether or not the lease will issue. Third, if the permittee will not exchange lands and the cost of compliance with the lease terms does not defeat his showing of commercial quantities, the Secretary still retains the option of withdrawing the public lands [21] or recommending to Congress that the preference lease right be cancelled upon payment of just compensation.[22]

■ If, as the defendants insist, an EIS done on proposed lease terms will differ from one done on the issuance of the lease, it is contrary to the goal of NEPA to examine only one option among many. It is true that it is the setting of the lease terms which allows the Secretary maximum discretion. Accordingly, if the Secretary decided to set lease terms, he should have before him a comprehensive EIS which includes a careful examination of possible performance lease standards, alternative methods for meeting those standards, and estimated costs of compliance. The EIS should not, however, be so limited that (1) it does not assess the overall environmental impact of the issuance of the lease, or (2) fail to recommend, if necessary, any one of the three options available to the Secretary.

Furthermore, intervenors' contention that NEPA will be best served by deferring an EIS to the mining plan approval stage conflicts sharply with NEPA's reasonable policy requiring an EIS prior to the "irrev-

---

**21.** Defendants claim that withdrawal of public lands pursuant to 43 U.S.C. § 1701 is subject to the valid existing rights of preference lease applicants. We need not reach the issue of whether such withdrawal would constitute a taking. It is enough that the Secretary maintains he has the discretion to withdraw the lands.

**22.** Analysis of alternatives in an EIS is not confined to actions within the authority of the Secretary. The EIS also serves to notify Congress and the Executive of recommended alternatives to the proposed action which might be less environmentally harmful. *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).

ersible and irretrievable commitments of resources." 42 U.S.C. § 4332. Although an EIS may well be necessary before an approval of a mining plan or the granting of a mining permit under the Surface Mining Control and Reclamation Act of 1977, NEPA demands, nevertheless, that a detailed and informed analysis of the environmental costs be prepared and available prior to the issuance of the lease.

### Conclusion

In accordance with the foregoing, plaintiffs' motion for summary judgment is granted in part and denied in part. Likewise, the motions of defendants and intervenors is granted in part and denied in part. An appropriate Order accompanies this Opinion.