**NATIONAL WILDLIFE
FEDERATION, Plaintiff,**

v.

**Robert F. BURFORD, et al.,
Defendants.**

**Civ. A. No. 85–2238.**

United States District Court,
District of Columbia.

Dec. 4, 1985.

Norman L. Dean, Jr., Kathleen C. Zimmerman, Washington, D.C., for plaintiff.

U.S. Dept. of Justice, Susan V. Cook, Pauline H. Milius, Jose R. Allen, Jacques B. Gelin, Washington, D.C. (Office of the Solicitor, U.S. Dept. of Interior, Claire S. Newcomer, Gary L. Bohlke, Michael Jeter, Richard J. Woodcock, Washington, D.C., of counsel), for defendants.

Steven R. Ross, Charles Tiefer, Michael L. Murray, Washington, D.C., for intervenor-plaintiff House of Representatives.

Constance E. Brooks, R. Norman Cramer, Jr., Casey Shpall, Denver, Colo., Richard D. Godown, Tim Haake, Washington, D.C., for defendant-intervenor Mountain States Legal Foundation.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### Introduction

Plaintiff, an environmental organization, brought suit against the Director of the Bureau of Land Management, the Secretary of the Interior and the Department of the Interior to challenge the lifting of protective restrictions on certain federal lands. Plaintiff's cause of action arises under the Federal Land Policy and Management Act, the National Environmental Policy Act of 1969 and the Administrative Procedure Act. The case is now before us on a motion to intervene by Congressman John F. Seiberling, defendants' motion to dismiss and plaintiff's motion for a preliminary injunction.

### Background

This litigation focuses on defendants' termination of protective classifications and revocation of withdrawals on approximately 170 million acres of public lands since 1981. The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* (1982) (FLPMA), establishes comprehensive rules for the management of federal lands. The FLPMA includes two systems for preserving land in the public domain and thereby for protecting it from private ownership and development. "Classifications" allow the Department of the Interior to categorize lands according to their proper use. "Withdrawals" directly remove lands from private development and exploitation. Subject to certain procedural controls, the Secretary of the Interior may open land to private development by terminating the applicable classification or withdrawal. *See* 43 U.S.C. §§ 1712(d), 1714. Since the passage of the FLPMA in 1976, defendants have terminated classifications on 160.8 million acres of land, Parker Affidavit at ¶ 35, and revoked withdrawals for 20 million acres, Edwards Affidavit 1A at ¶ 25.

Plaintiff contends that in lifting these restrictions, defendants improperly ignored certain requirements of the FLPMA. Among plaintiff's claims are that defendants failed to review land status actions in the context of land use planning, to submit to the President and Congress withdrawal revocation recommendations, to promulgate rules and regulations governing withdrawal revocations, to provide for public participation, and to prepare environmental impact statements. Plaintiff ultimately seeks a declaration that defendants' land withdrawal program violates applicable law and regulations; an order both reinstating all withdrawals, classifications or other designations in effect on January 1, 1981[1] and enjoining defendants from taking any action inconsistent with these designations until they comply with their statutory obli-

---

**1.** Although the figures in this case focus on events since 1976, it appears that most if not all of the contested terminations occurred since January 1, 1981.

gations; and an order mandating that defendants rescind all directives, instructive memoranda, manuals or other documents regarding classification or withdrawal terminations until they have promulgated certain rules and regulations.

Plaintiff now moves for a preliminary injunction. The claim for relief here is more narrow than that in the Complaint. Specifically, plaintiff requests this court, *inter alia*, to enjoin defendants from modifying, terminating or altering any withdrawal, classification or other land use designation in effect on January 1, 1981,[2] and to enjoin them from taking any action inconsistent with the 1981 status quo. It "does not seek to invalidate existing mining claims or mineral leases nor does it seek to overturn completely sales or exchanges of previously withdrawn lands." Plaintiff's Reply Memorandum at 8–9.

In the meantime, defendants have moved to dismiss the entire action for failure to join indispensible parties, in particular the holders of mining claims and mineral leases on the disputed lands. They have also moved to dismiss Count II of the Amended Complaint, relating to failure to submit recommendations to the President and Congress, on the ground that the plaintiff lacks standing to raise this claim.

In addition to the motion for a preliminary injunction and motion to dismiss, we have before us a motion for intervention. Congressman John F. Seiberling, Chairman of the House Subcommittee on Public Lands, seeks to intervene in this action as a plaintiff. We will address these three motions in reverse order.

### Discussion

#### I. Motion for Intervention

■ Congressman Seiberling's motion to intervene invokes Federal Rule of Civil Procedure 24. Because we find that Congressman Seiberling meets the require-

ments for permissive intervention under Rule 24(b), we do not need to reach the question of whether he also qualifies under subdivision (a).

Rule 24(b) allows intervention "upon timely application" by a person whose claim or defense shares with the main action a common question of law or fact. Although Congressman Seiberling moved to intervene three months after the complaint was filed, we decline to hold that his motion was untimely. To begin with, the amount of time elapsed since the complaint does not itself determine timeliness. *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907 (D.C.Cir.1977); *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C.Cir.1972). Instead, we must look both to the purpose for which intervention is sought and to the improbability of prejudice to those already in the case. *NRDC v. Costle*, 561 F.2d at 907; *Hodgson*, 473 F.2d at 129. Although Congressman Seiberling seeks to intervene for the full course of the litigation, we can see no possible prejudice to defendants as a result of the timing of this motion.

Having satisfied the threshold requirement of timely application, Congressman Seiberling also meets the substantive criteria of Rule 24(b)(2). Congressman Seiberling alleges that defendants violated § 204($l$) of the FLPMA, 43 U.S.C. § 1714($l$), which requires submission to Congress of recommendations for land withdrawal revocations. Plaintiff raises the same claim in Count II of its Amended Complaint. As these identical allegations thus clearly show, the motion to intervene presents common questions of law or fact.[3]

Defendant attempts to block intervention by arguing that Congressman Seiberling lacks the necessary injury in fact for standing. We disagree. It is not necessary to prolong this discussion with citations that injury in fact is a key requirement of standing. *Association of Data Processing Ser-*

---

**2.** Plaintiff never revised the motion, which refers to October 21, 1976, the date mentioned in the original Complaint. We believe, however, in light of both the Amended Complaint and the argument at the hearing, that plaintiff intends to focus on the 1981 date.

**3.** Since the § 204($l$) claim satisfies the standard of Rule 24(b)(2), we do not need to address the issue of Congressman Seiberling's defense of the provision's constitutionality.

*vice Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). If Congressman Seiberling was merely complaining that defendants have not faithfully executed the law, his claim, as a generalized grievance, would not constitute injury in fact. All citizens share his interest, *American Federation of Government Employees v. Pierce*, 697 F.2d 303, 305 (D.C.Cir.1982), and it is well settled that such "generalized grievances about the conduct of government" do not afford standing. *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1956, 20 L.Ed.2d 947 (1968); *American Federation of Government Employees*, 697 F.2d at 305.

However, Congressman Seiberling is not seeking just to express a generalized grievance. He is suing to enforce his right as a Congressman to participate in withdrawal revocation decisions. Legislators have standing to challenge objective diminution of their influence in the legislative process. *See Harrington v. Bush*, 553 F.2d 190, 212 (D.C.Cir.1977); *Kennedy v. Sampson*, 511 F.2d 430, 434 (D.C.Cir.1974). In particular, executive action that nullifies a specific congressional opportunity to vote constitutes injury in fact to individual Members of Congress. *See Goldwater v. Carter*, 617 F.2d 697, 702 (D.C.Cir.1979), *vacated on other grounds*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979).

In the present case, the FLPMA requires the President to transmit to the President of the Senate and the Speaker of the House the Secretary's recommendations for withdrawal revocations. The statute further authorizes a concurrent congressional resolution that the recommendations should not be implemented.[4] Defendants' bypassing of the congressional review process thus denied to Congressman Seiberling the potential opportunity to approve or reject proposals to terminate specific land withdrawals. This diminution of Congressman Seiberling's authority caused injury in fact and thus guarantees his "personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).[5]

Congressman Seiberling also fulfills the causation and redressability criteria for standing. A plaintiff must not only demonstrate injury in fact, but also show both that the injury can be traced directly to defendant's action. *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976), and that the relief he requests will redress the injury. *Id.* at 38, 96 S.Ct. at 1924. Mountain States Legal Foundation argues that because the statute channels the Secretary's recommendations through the President, Congressman Seiberling cannot satisfy either requirement. We reach a different conclusion. The stat-

---

**4.** As the government defendants note in their opposition to the preliminary injunction, this provision for concurrent resolution may be unconstitutional after *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). However, defendants do not request a ruling on its constitutionality, *see* Opposition to Motion to Intervene at 6, and we do not express an opinion on the issue. As long as this provision remains in the statute, the FLPMA promises to every Member of Congress the opportunity to vote on the Secretary's recommendations. It is of no concern that there is no ongoing legislative process, as Mountain States emphasizes. Mountain States Opposition at 11 n. 11. Here, defendants' failure to submit recommendations to Congress precluded such a process from even commencing. Congress had nothing to review.

**5.** We reject defendants' suggestion that Congressman Seiberling cannot assert the interest of Congress in the absence of a congressional resolution authorizing such representation. Where a Member of Congress is not appointed to sue, he must demonstrate personal injury, *Harrington*, 553 F.2d at 199–200 n. 41. However, he can do so indirectly by showing (1) injury in fact to Congress and (2) injury to himself, as an individual legislator, because of the harm done to the institution. *Id.* Here, Congress' exclusion from the withdrawal revocation process constitutes injury to Congress. Because of this exclusion, Congressman Seiberling lost a concrete opportunity to exercise his voting authority as a Member of Congress. The fact that he was also Chairman of the Subcommittee on Public Lands does not diminish his standing as an individual legislator. *See National Wildlife Federation v. Watt*, 571 F.Supp. 1145, 1147 (D.D.C.1983) (recognizing standing of Congressman Udall "as a Congressman and as a Committee Chairman").

ute allows the President no discretion. He *must* transmit to Congress the recommendations he receives. As a mere conduit for the Secretary's recommendations, the President does not interrupt the causal connection between defendants' actions and the lack of any reporting to Congress. Similarly, if defendants are ordered to report to the President, the mere implication that the President might withhold information from Congress and thus violate the express terms of the FLPMA does not threaten redress enough to interfere with standing.

Accordingly, we grant the motion to intervene.

## II. *Motion to Dismiss*

### A. *Failure to Join Indispensible Parties*

 While the holders of mining claims and mineral leases are necessary parties, their absence does not compel dismissal. Defendants assert that plaintiff should have joined as defendants all third parties who hold mining claims or mineral leases to the lands at issue. Federal Rule of Civil Procedure 19 requires a two-step analysis for such compulsory joinder claims. First, the court must determine if the absent party falls within the category of persons "to be joined if feasible." Second, the court must determine whether, in equity and good conscience, the case should proceed without the third party or be dismissed. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 108–09, 88 S.Ct. 733, 737–38, 19 L.Ed.2d 936 (1968); *Defenders of Wildlife v. Andrus*, 77 F.R.D. 448, 451 (D.D.C.1978).

The mining claimants and lessees meet the first requirement of compulsory joinder, as set out in Rule 19(a). They all claim an interest in the lands that are the subject of this action. *See* Rule 19(a)(2). In the case of the mining claimants, this interest may even amount to exclusive possession and enjoyment. 30 U.S.C. § 26 (1982).

Furthermore, disposition of the action in their absence could impair or impede the ability of these parties to protect their interests. *See* Rule 19(a)(2)(i). If plaintiff's injunction is granted, such relief could sus-

pend development of the third parties' interests. Until as late as 1991, defendants would be unable to issue patents, approve lease activities—in short, to authorize any commercial activity on these lands. Furthermore, if Congress rejects the Secretary's recommendations to revoke the withdrawals, those parties who now hold mining claims or mineral leases could lose their interest altogether. The fact that plaintiff does not directly seek to void these interests is irrelevant. What matters is the effect of ultimate disposition of the case.

The third parties here could suffer harm not just by disposition of the action but by disposition in their absence. To be sure, the present defendants share the interest of these parties in resisting plaintiff's proposed injunction. In fact, the intervention by the Mountain States Legal Foundation, which represents a group of mining and milling lessees, ensures advocacy of at least some of the third parties' claims. However, only the absent parties can accurately measure the full value of the interests that they now hold and the extent to which that value could be impaired or lessened. Their absence weakens defendants' ability precisely to articulate the harm that plaintiff's requested relief would cause. In sum, it cannot be denied that these holders of mining claims and leases have legitimate interests.

Our finding that the mining claimants and lessees are necessary parties under Rule 19(a), however, does not end the inquiry. In determining whether or not to dismiss, we must consider and weigh (1) the extent of potential prejudice to these parties, (2) the possibility of avoiding this prejudice by shaping alternative measures of relief, (3) the adequacy of judgment in these parties' absence, and (4) the adequacy of plaintiff's remedy if we dismiss. Balancing these factors, we conclude that the action may proceed without the mining claimants and lessees. Our reasoning may be summed up in the discussion which follows.

The fact that dismissal of plaintiff's claims for relief in this court would effec-

tively foreclose plaintiff from relief elsewhere outweighs the more speculative harm to the absent parties. As we discussed, *supra,* plaintiff's proposed injunction would suspend development of and, depending on plaintiff's success in obtaining permanent relief, could possibly revoke existing claims or leases. Thus, if the case proceeds without the presence of the claimants or lessees, these third parties would suffer temporary hardship; the possibility of permanent harm, however, is only a matter of speculation.

In contrast, dismissal for failure to join would deny plaintiff an adequate forum in which ever to prosecute its claim. The availability of an alternative forum represents a "critical consideration" in deciding joinder questions. *Pasco International (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 500 (7th Cir.1980). The lands involved in this case lie in seventeen different states. The absent parties probably cover an even broader geographical range. Because of problems of jurisdiction and venue, plaintiff could never join all defendants in one forum. Requiring it to bring seventeen separate lawsuits or even to combine actions through the device of multidistrict litigation would create enormous administrative disorder and delay. Dismissal, therefore, would effectively discourage and, for all practical purposes, put an end to this litigation. Balanced against the merely temporary or speculative harm to the absentees, this harsh result supports denial of the defendants' motion to dismiss.

The two other factors listed in Rule 19(b) do not influence our determination. If, as plaintiff contends, defendants have illegally terminated classifications and withdrawals, it may well be necessary to grant the injunction requested. Any lesser relief that sought to provide protection for the interest of third parties would have the effect of permitting defendants' actions to continue without further challenge. The third factor—adequacy of judgment in the third parties' absence—also does not enter into our decision, since their presence is not essential to shape the judgment.

The "public rights" exception provides further support for denial of the motion to dismiss. This doctrine derives from the teaching of *National Licorice Co. v. NLRB,* 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940), where the Supreme Court held that the NLRB could order an employer not to enforce certain illegal contracts with its employees, even though the employees, who had a vital interest in the matter, had not been joined. As the Court reasoned, "[i]n a proceeding so narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Id.* at 363, 60 S.Ct. at 577. Here, as in *National Licorice,* the plaintiff's cause of action is grounded in the assertion of public rather than private rights. The public's interest in disposition of federal lands and, more concretely, in participating in the management of these lands is a matter of transcending importance. It extends this case far beyond the boundaries of private dispute.

The specific facts of *National Licorice* do not limit the "public rights" exception to cases where the absentees' interest is being advanced. Subsequent courts have applied the exception even where disposition could harm the absent parties. *See, e.g., Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919 (11th Cir.1982), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed. 2d 283 (1982); *Swomley v. Watt,* 526 F.Supp. 1271 (D.D.C.1981); *Natural Resources Defense Council, Inc. v. Berklund,* 458 F.Supp. 925 (D.D.C.1978), *aff'd per curiam,* 609 F.2d 553 (D.C.Cir.1979).

The policy behind the "public rights" exception emphasizes the need to permit plaintiff to proceed without joining the mining claimants and lessees. As Judge June Green noted in *NRDC v. Berklund,* 458 F.Supp. 925, the "public rights" exception serves to remove joinder as an obstacle that might otherwise preclude litigation against the government. *Id.* at 933. Because plaintiff lacks an alternative forum, requiring joinder of all parties could foreclose forever a legitimate cause of action against the government. We cannot sanc-

tion such a Draconian result. We therefore have no difficulty in denying the motion to dismiss for failure to join indispensible parties.

### B. *Lack of Standing on Count II*

■ Defendants argue that plaintiff National Wildlife Federation lacks standing on Count II of its Amended Complaint, the claim that defendants violated the FLPMA by failing to submit recommendations to the President and Congress. As well indicated at the hearing, National Wildlife Federation might lack standing if it stood alone. However, this issue has become moot because we have permitted Congressman Seiberling to intervene as a plaintiff. As we discussed above, Congressman Seiberling has standing. His standing is sufficient to shield Count II from defendant's motion to dismiss. Where one plaintiff has standing, we do not need to consider the standing of other plaintiffs. *See, e.q., Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981). Accordingly, we deny defendants' motion to dismiss Count II for lack of standing.

### III. *Motion for a Preliminary Injunction*

■ In ruling on plaintiff's motion for a preliminary injunction, it is well settled that we must consider certain established criteria, *i.e.,* (1) the likelihood of plaintiff's success on the merits (2) the prospect of irreparable injury in the absence of relief (3) the potential harm to other interested parties, and (4) the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977). After weighing these factors, it is our judgment that a preliminary injunction should issue.

### A. *Likelihood of Success on the Merits*

1. *Failure to Review Land Status Actions in the Context of Land Use Planning*

In considering the likelihood of success on the merits of plaintiff's several claims, we consider only two of the more impor-

tant. The first is plaintiff's claim that defendants improperly terminated land classifications without first preparing Resource Management Plans. We hold that there is a likelihood that plaintiff will succeed on the merits.

Section 202 of the FLPMA, concerning classifications, directs the Secretary of the Interior to develop "land use plans," which establish the use of the public lands. 43 U.S.C. § 1712(a). Subsection (d) further provides:

> Any classification of public lands or any land use plan in effect on October 21, 1976, is subject to review in the land use planning process conducted under this section, and all public lands, regardless of classification, are subject to inclusion in any land use plan developed pursuant to this section. The Secretary may *modify or terminate any such classification consistent with such land use plan.*

42 U.S.C. § 1712(d) (emphasis supplied). Since 1976, defendants have terminated classifications affecting approximately 160 million acres of land. Yet, as plaintiff alleges and defendants do not deny, defendants have completed only a fraction of the land use plans for these areas. Thus, the vast majority of classification terminations have occurred outside the context of land use planning.

Defendants' reliance on "Management Framework Plans" (MFP's) is misplaced and does not satisfy the statutory expectations of "land use plans." As section 202(a) evidences, Congress sought a comprehensive system of land use plans. In its regulations, the Interior Department identifies these land use plans as "Resource Management Plans" (RMP's). 43 C.F.R. § 1601.0–5(k) (1984). It is true that Congress did not reject altogether existing MFP's. It recognized that RMP's would not be ready immediately, *see* 43 U.S.C. § 1732(a) (referring to land use plans "when they are available"), and it noted that BLM's pre–FLPMA system of land planning was consistent in general principles and practices with the objectives of the Act. H. Rep. No. 1163, 94th Cong., 2d

Sess. 5 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 6175, 6179.

However, looking at the matter in its totality, it is clear to us that Congress approved only temporary reliance on MFP's. It never authorized the vast scale of classification terminations without land use plans which we see today, more than nine years after the passage in 1976 of the FLPMA. MFP's may confirm to the general principles of the FLPMA, but they are not identical substitutes to RMP's. The land use plans Congress envisioned would modify existing plans in several aspects, including public participation. By terminating classifications for 160 million acres of land outside the context of land use planning, defendants have simply evaded the statute's directive that land use plans "shall be developed" and that the Secretary terminate classifications "consistent with such land use plans."

Defendants' obligation to review land status actions in the context of land use planning, however, does not extend beyond classification terminations. Plaintiff reads section 202(d) also to apply to withdrawal revocations, and it argues that defendants' failure to tie withdrawal revocations to land use planning thus violates the FLPMA. We disagree with plaintiff's reading of the statute. Classification terminations and withdrawal revocations are separate and distinct. Section 202(d) links land use planning to classification terminations. It never mentions withdrawal revocations, which appear in a separate section of the statute. *See* 43 U.S.C. § 1714. The history of classifications and withdrawals further contradicts plaintiff's equation of the two procedures. Classifications derive from the Classification and Multiple Use Act of 1964, Pub.L. No. 88–607, 78 Stat. 986, which expired in 1970. Withdrawals, on the other hand, date back to the nineteenth century and were executed by the Secretary largely without statutory guidance. Having developed along distinct paths, classification terminations and withdrawal revocations do not now merge in section 202(d), particularly since the statute separates the two terms. Therefore, plaintiff's likely success on its first claim applies only to defendants' terminations of land classifications.

### 2. *Lack of Public Participation*

Despite the statutory command, defendants have failed to provide for public participation in their withdrawal revocation decisions. Section 309(e) of the Act, 43 U.S.C. § 1739(e), requires the Secretary to establish procedures to give the public an opportunity "to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, *and the management of*, the public lands" (emphasis supplied). Defendants apparently have not permitted public input into their decisions to revoke land withdrawals. This lack of public participation both violates the text of the statute and frustrates Congress' intent that "[p]lanning decisions are to be made only after full opportunity for public involvement in the planning process." H. Rep. No. 1163 at 2, U.S.Code Cong. & Admin.News 1976, p. 6176. Defendants protest that they offer numerous avenues for public participation in land use planning. Yet the statute calls for participation also in the "management" of public lands. Withdrawal revocations fall into this "management" category. We find, therefore, that plaintiff is likely to succeed on this claim.

If plaintiff ultimately prevails on the two counts discussed, it could obtain the permanent injunction it seeks. Thus, in light of our conclusion that plaintiff will likely succeed on these counts, we do not need to reach the merits of plaintiff's other claims, including its claim that defendants failed to submit withdrawal recommendations to the President and the Congress as required by § 204(*l*) of the Act.

### B. *Irreparable Injury*

We have no problem in holding that defendants' actions in lifting protective land restrictions will irreparably injure plaintiff's members unless enjoined. In ordering classification terminations and withdrawal revocations, defendants removed

the only absolute shield against private exploitation of these federal lands. It is true, as defendants contend, that the classification terminations and withdrawal revocations do not immediately open the lands to mining and mineral leasing. They merely trigger the operation of certain discretionary land laws. Yet, as defendants also concede, some of the backup safeguards are optional. For example, the Secretary may choose whether or not to prepare an environmental impact assessment or statement. Transcript of September 16 Hearing at 54, 58. Moreover, neither the statutes nor the regulations can prohibit all development: they can only regulate its process.

If defendants have improperly terminated classifications or withdrawals to begin with, *any* allowance of mining or leasing can cause irreparable harm. Such activity can permanently destroy wildlife habitat, air and water quality, natural beauty and other environmental values. Defendants' suggestion that plaintiff's members can still hike, fish and otherwise enjoy these lands ignores both aesthetic interests and the process whereby a holder of a mining claim can gain the right to exclusive possession. Similarly, defendants' calculations limiting the acres that have actually been leased or mined [6] demonstrates nothing about the future impact of their actions. Without the preliminary injunction, defendants' termination of classifications and withdrawals could lead to the permanent loss of lands to public use and enjoyment— an injury we feel would be irreparable.

### C. *Harm to Interested Parties*

While we acknowledge that the preliminary injunction would harm third parties, we do not view this injury as so serious as to outweigh the other factors supporting the injunction. The preliminary injunction would bar present holders of mining claims and mineral leases from developing their interests. To the extent they have made investments in obtaining their claims or leases or in beginning development, the delay in their investment return would rep-

resent financial injury. However, the preliminary injunction alone would not sever these parties' interests. If defendants prevail on the merits, it would only delay their realization. Furthermore, the injunction is not likely to reduce the ultimate value of the ore to be mined.

### D. *The Public Interest*

The public interest clearly favors granting the preliminary injunction. In section 102 of the FLPMA, Congress declared "it is the policy of the United States that—(1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest." 43 U.S.C. § 1701(a)(1). This statement of policy, which provides the basis for plaintiff's claims for relief, underscores the public interest in ensuring orderly procedures for removing certain federal controls over government-owned lands. If defendants have violated the FLPMA in the process of terminating classifications and revoking withdrawals, the preliminary injunction will protect against further illegal actions pending resolution of the merits.

Furthermore, the preliminary injunction would serve the public by protecting the environment from any threat of permanent damage. Defendants' scenario of administrative havoc invokes a limited version of the public interest. While granting the preliminary injunction would inconvenience defendants and those parties holding specific interests in the lands at issue, denying the motion could ruin some of the country's great environmental resources—and not just for now but for generations to come.

For these reasons, we grant the plaintiff's motion for a preliminary injunction.

Orders consistent with the foregoing have been entered this day.

---

**6.** Defendants claim that only 845 acres are being mined. *See* Hearing Transcript at 55. As

the discussion of harm to private parties indicates, this is an axe that cuts both ways.