**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

v.

**Royston C. HUGHES et al., Defendants,**

**Utah Power and Light Company, Intervenor-Defendant.**

**Civ. A. No. 75–1749.**

United States District Court, District of Columbia, Civil Division.

June 14, 1978.

---

4. See *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 374 F.Supp. 184 (D.Del.1974).

Bruce J. Terris, Washington, D. C., for plaintiffs.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., for defendants.

Gerry Levenberg, Washington, D. C., for intervenor-defendant.

## AMENDED ORDER

JOHN H. PRATT, District Judge.

This cause having come on for hearing, upon notice, on cross-motions for summary judgment filed by all parties herein, based upon the complaint and answer, the answers of the federal defendants to the interrogatories and requests for admission propounded by plaintiffs, and various affidavits and exhibits filed by the parties including the stipulation between plaintiffs and the federal defendants dated April 6, 1978; and

This Court having carefully considered all the evidence and having determined that the federal defendants have violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*, (1970) (NEPA), in their formulation, adoption, and implementation of a new federal coal leasing program; and

It appearing to this Court that unless restrained or otherwise ordered, the federal defendants, until the President's Environmental Message to Congress of May 23, 1977 is fully implemented, will continue to carry out the new federal coal leasing program without complying with NEPA; and

This Court finding that such action by defendants would cause irreparable injury to the interests of plaintiffs and the general public; it is hereby

ORDERED, that plaintiffs' motion for summary judgment as against the federal defendants be and hereby is granted, and

the motions for summary judgment of the federal defendants and defendant-intervenor Utah Power and Light Company be and hereby are denied.

It further appearing that the federal defendants have violated their mandatory, nondiscretionary duty pursuant to NEPA to consider fully all the environmental impacts of, and alternatives to, a new federal coal leasing program before deciding to adopt and implement that program, it is further

ORDERED, that the federal defendants, their agents and employees and all those in concert or participation with them are enjoined from taking any steps whatsoever, directly or indirectly, to implement the new coal leasing program, including calling for nominations of tracts for federal coal leasing, and issuing any coal leases except:

(1) when the proposed lease is required to maintain an existing mining operation (a) at the average annual level of production existing as of September 27, 1977, or (b) to provide reserves necessary to meet binding contracts (excluding letters of intent and memoranda of understanding) existing on September 27, 1977, and the extent of the proposed lease is not greater than is required to meet criterion (a) or (b) for eight years in the future. Any lease issued under this paragraph will provide that annual production from the lease area shall not be greater than the average annual level of production existing as of September 27, 1977, or the amount needed to meet the annual requirements of the contract existing on September 27, 1977; or

(2) when the proposed lease is necessary because (a) mining operations existing on September 27, 1977, are being conducted that could remove the coal deposit as part of an orderly mining sequence; and (b) the size, location, or physical characteristics are such that removal of the coal reserves sought to be leased, except in conjunction with ongoing operations, would (i) involve costs demonstrably so high that it would not be sufficiently profitable to develop the deposit in the reasonably foreseeable future or (ii) significantly increase environmental damage. This paragraph would not apply if there is any reasonable alternative by which the existing mine could continue operations and the coal deposit subject to the proposed lease could be mined at a later date without either (i) or (ii) occurring. The extent of the proposed lease cannot be greater than necessary to provide coal for five years in the future at the average annual level of production existing as of September 27, 1977; or

(3) when the Secretary determines to issue the proposed lease under the provisions of Section 510(b)(5) of the Surface Mining Control and Reclamation Act of 1977 in exchange for a federal coal lease in an alluvial floor, except that no lease may be issued under this paragraph in exchange for a federal lease held by an applicant who is not entitled to have its surface mining permit approved under Section 510(b)(5) of that Act; or

(4) when the proposed leases will be used to conduct a project authorized by the Administrator of the Energy Research and Development Administration under Section 908 of the Surface Mining Control and Reclamation Act of 1977, and the technology cannot be adequately demonstrated on existing leases or private coal holdings. Any such lease shall provide for no more than 500,000 tons annual production and the demonstration shall meet all of the requirements of regulations promulgated pursuant to Section 908; or

(5) the following lease applications:

(a) ES 12304 (Ky.)--Ryans Creek Coal Company

(b) Co 23396--Prosper Lombardi

(c) NM 28093--Western Coal Company

(d) NM-A 29460--Lower Colorado River Authority

(e) NM 26630 (Okla.)--General Portland, Inc.

(f) U 25683--Braztah Corp.

(g) U 28297--Coastal States

The federal defendants have determined that environmental impact statements are not required to be prepared on the total acreage sought in the applications listed in (a) and (b) and are required to be prepared on the total acreage sought in the applica-

tions listed as (c), (d) and (f). The determination whether an environmental impact statement is required for applications (e) and (g) has yet to be made.

Federal defendants are not enjoined from processing any lease application, as filed or as modified, to the extent necessary to determine whether it meets the criteria of paragraphs (1) through (4). Any lease which has been determined to meet any of the criteria of paragraphs (1) through (4) or which is listed in paragraph (5) shall be issued only in conformance with all applicable federal laws and regulations including the provision of Section 102(2)(C) of the National Environmental Policy Act.

Federal defendants will notify plaintiffs not less than 21 days before the Secretary of the Interior's approval of a lease sale offering concerning information which appears to qualify an applicant for a specific lease under the criteria of paragraphs (1) through (4) of this Order.

Nothing in this Order shall affect whatever rights federal defendants may have under Rule 60 of the Federal Rules of Civil Procedure to seek relief from the judgment of the Court or whatever defenses plaintiffs may have to any such relief sought by federal defendants.

■ Federal defendants are not enjoined from processing any preference right lease applications under Section 2(b) of the Mineral Leasing Act of 1920, 30 U.S.C. § 201(b), for the purpose of determining (a) whether the applications have been timely filed; (b) whether the prospecting permit was properly granted; and (c) if the prospecting permit was renewed, whether timely so. This Order does not prevent the federal defendants from evaluating the amount and quality of coal currently under federal lease and subject to preference right lease application which can be mined consistent with environmental standards such as reclamation potential, protection of endangered species, and preservation of prime farm lands and alluvial valley floors.

The federal defendants are authorized to process 20 preference right lease applica-

tions. The preference right lease applications are to be those which would cause the least environmental impact of all preference right lease applications pending before the Secretary on the date of this agreement. In selecting the 20 applications, the federal defendants shall choose first those preference right lease applications which (a) are for tracts on which at least 90% of the total reserves would be mined by deep mining rather than surface methods and the total amount of surface mining would affect no more than 50 acres; and (b) are for operations which would not require substantial additional transportation facilities or water storage or supply systems in the region and would not involve substantial new industrial development in the region. The Secretary shall not process any preference right lease applications under this section which will require the construction of substantial additional transportation facilities or water storage or supply systems in the region or which he has reason to believe may involve major new industrial development at or near the mine site.

As to these lease applications, such processing includes analysis of issues regarding the specific lease site, including analysis of logical mining units, preparation of environmental impact statements or environmental assessments, and determinations of commercial quantities of coal.

Federal defendants are not enjoined from fully processing competitive coal lease application W 50061, Edison Development Company.

■ Federal defendants are not enjoined from engaging in any general studies or from preparing any general analyses or environmental impact statements with regard to federal coal leasing on either a national or regional basis. Federal defendants may prepare comprehensive land use plans as long as they do not recommend the leasing of any tracts of federal coal; however, the plans can consider present and potential uses of the public lands. Federal defendants are not enjoined from making any decisions necessary to the formulation and completion of the new Programmatic Envi-

ronmental Impact Statement required herein.

Plaintiffs will notify federal defendants of any action allegedly in violation of this Order and give defendants at least 21 days to cure the alleged violation before seeking relief from the Court.

It is further

ORDERED, that federal defendants, their agents and employees, and all those in concert or participation with them, are enjoined from failing to take all steps necessary to correct the violations of law found by this Court to have occurred, including specifically the following actions:

(1) Within 60 days of the entry of this Order, the federal defendants shall issue an official press release, publish a notice in the Federal Register, and take all other steps it believes appropriate (including sending an announcement to all those who have previously commented on the draft or final federal coal leasing programmatic EIS) to achieve widest possible dissemination of its announcement that it will reevaluate its coal leasing program and policy and that it will accept comments on the final EIS issued in September 1975 for 60 days after publication of the announcement in the Federal Register.

(2) Thereafter, defendants shall prepare and publish a draft supplement to the final EIS, seeking to correct the defects found by this Court to exist, and responding to the significant issues raised in comments previously received on the draft and final EIS's. Publication of this draft supplement should be announced by appropriate notice in the Federal Register and elsewhere, as indicated above, and circulated to all interested federal, state and local governmental agencies and interested members of the general public. Comments shall be expressly invited thereon, with comments received until at least 45 days after the notice of release of the draft supplement is published in the Federal Register.

(3) Thereafter, defendants shall prepare a new final EIS, which combines and integrates the material in the draft supplement with the final EIS previously released, which fully responds to the comments received on the draft supplement, and which otherwise fully complies with NEPA.

(4) After the new final EIS has been made available to the public and is on file with the Council on Environmental Quality for at least 30 days, the defendant Secretary of the Interior shall personally reevaluate federal coal leasing policy, based on the information contained in the new final EIS, and shall make a new decision as to whether a new leasing program shall be instituted and, if so, what kind of program it should be.

Plaintiffs are awarded their costs of bringing this suit.

This modification of the Court's Order of September 27, 1977, is retroactive to that date.

## STATEMENT OF REASONS PURSUANT TO ORDER OF REMAND

On May 19, 1978, the Court of Appeals granted the joint motion of plaintiffs and federal defendants, filed pursuant to the procedure set forth in *Smith v. Pollin,* 90 U.S.App.D.C. 178, 179, 194 F.2d 349, 350 (1952), to remand this matter to the District Court to modify its injunctive decree of September 27, 1977.

In its Order, the Court of Appeals noted that Intervenor-Defendant Utah Power and Light "raises the substantive argument that the proposed modified decree, like the decree of Sept. 27, is invalid because it violates the rights of preference right lease applicants." Order at 2. The District Court having previously "decided this issue without discussing it at length," the Order directed the District Court "to fully elaborate its reasoning, without prejudice to Utah Power's raising these arguments on appeal." Order at 3. Our elaboration follows.

Without needing to decide the question whether a preference lease applicant has a vested right to a lease or whether the Secretary of the Interior (hereinafter "Secretary") has no discretion not to issue such a

lease, it is clear to us that the new federal coal leasing program of May 23, 1977 includes preference right leasing. The Secretary was directed to "manage the coal leasing program to assure that it can respond to reasonable production goals *by leasing only those areas where mining is environmentally acceptable*" and "to scrutinize existing coal leases (and applications for preference right leases) to determine whether they show prospects *for timely development in an environmentally acceptable manner.*" *President's Memorandum to Secretary of the Interior,* May 23, 1977. (emphasis supplied). It is unquestioned that the Department of the Interior in setting forth the extent and scope of the federal leasing program covered by its programmatic EIS, stated that "action will include preference right applications, plus future competitive sales." *Coal Programmatic EIS, Summary,* ¶ 2, §§ 1–80, 8–29, 8–32.

Preference right leasing has an important role in national coal policy. In 1970, some 778,000 acres of federal land were under lease for coal development, from which 7.4 million tons of coal were produced that year. Preference right leasing applications covering almost 500,000 additional acres are presently pending with 10 billion tons of coal potentially recoverable. Clearly, these applications represent a large factor in any federal coal leasing program and to exclude them from the program's coverage would be to undercut the effectiveness of a national program.

■ Again, whether the preference right lease applicant has a vested right to a lease, the Secretary has the discretion under the Mineral Leasing Act to choose the terms for issuance of such a lease, as exemplified in the 1970 and 1973 moratoria, partial and total, on the issuance of federal prospecting permits and coal leases. Preference right leases which failed to meet the 1973 short-term criteria, for example, were not issued as a consequence. In 1976, this moratorium was lifted but in 1977 the Secretary announced new short-term criteria applicable to preference right leases, with an exception to such criteria when issuance was in the "public interest."

■ The Secretary also has the discretion to select the time to issue a preference right lease, to lease only part of the land covered by a prospecting permit and to set lease terms. *See* 30 U.S.C. §§ 201(b), 207. In an analogous case, the Court of Appeals recently held that the Secretary has the power to include as a condition of an oil and gas lease a clause permitting termination for environmental reasons and that NEPA requires that he consider the inclusion of such a clause. *State of Alaska v. Andrus,* 188 U.S.App.D.C. ——, —— – ——, 580 F.2d 465, 483–485 (1978). The Mineral Leasing Act does not limit the Secretary's power to cancel administratively a permit or a non-competitive lease "on the basis of pre-lease factors." *Boesche v. Udall,* 373 U.S. 472, 478–85, 83 S.Ct. 1373, 1377, 10 L.Ed.2d 491 (1963). The Act was intended to expand, not contract, the Secretary's control over the mineral lands of the United States. *Boesche v. Udall, supra,* 373 U.S. at 476, 481, 83 S.Ct. 1373.

■ The injunctive order of September 27, 1977 was predicated on our conviction that preferential right leasing was a proper and integral part of the federal coal leasing program, that such a program was subject to the requirements of Section 102 of NEPA, and that the federal defendants violated NEPA in failing to provide an adequate Programmatic EIS. The modification of the September 27, 1977 Order to permit the Secretary, *inter alia,* to process 20 of the pending preference right lease applications, which he in his discretion decides as involving the least deleterious environmental consequences, violates no existing rights of preference lease applicants. This is because under the September 27 Order, they have no right to have their applications processed at all, and under the modified order they have no right to have their applications processed by the Secretary in any particular sequence or in any particular period of time.

■ With respect to other matters adverted to by the Court of Appeals in its

Order of Remand are whether it would promote the interests of judicial economy and consistency to consolidate this case with *Natural Resources Defense Council v. Berklund*, Civil No. 75–0313. We have given careful consideration to this matter and point out the following factors.

(1) The legal and factual issues in these two cases are so dissimilar and unrelated as to prevent their effective joint resolution. *Berklund* concerns the interpretation of § 2(b) of the Mineral Leasing Act of 1920 and the sole issue is whether the Secretary's duty to issue a "preference right" lease to an otherwise qualified applicant is mandatory or discretionary. In *Hughes*, the basic issue is whether the Secretary is required to prepare a Programmatic EIS for the federal coal leasing program, including preference right leases and whether the submitted programmatic EIS is adequate. A narrow and tangential subsidiary issue is whether preference right leasing is to be included in the national program. The Court's disposition of *Hughes* will not predetermine the issue in *Berklund*. Accordingly, there is no "common question of law or fact" which would support this Court's exercise of discretion to order a consolidation pursuant to F.R.C.P. 42(a).

(2) The two cases are in different procedural postures. In *Hughes*, summary judgment was granted on September 27, 1977 and, after separate appeals by the federal defendants and intervening defendant Utah Power, the matter has been remanded to this Court for modification of the original summary judgment in the light of a proposed settlement between plaintiffs and federal defendants. This modified order has been issued this day. On the other hand, *Berklund* is before its third judge in three years awaiting oral argument on motions for summary judgment. Consolidation would materially delay a prompt determination in *Hughes* to the prejudice of the parties,[1] particularly the federal defendants, as manifested by the recent affidavits

of the Secretary dated June 8, 1978, and that of Guy Martin dated April 3, 1978, both filed herein on June 8, 1978. These affidavits which stress the compelling importance of a prompt and final disposition of *Hughes* and the serious prejudice resulting from further delay, are attached hereto.

For the foregoing reasons, we find that judicial economy and consistency will not be promoted by a consolidation of these two cases, and if such considerations were present they are far outweighed by the prejudicial delay which would ensue. Accordingly, we have denied plaintiff's motion to consolidate filed June 5, 1978.

## SECOND AFFIDAVIT OF GUY MARTIN

I, Guy Martin, being first duly sworn, depose and say:

1. I am Assistant Secretary—Land and Water Resources, Department of the Interior. I held this position at the time of the entry of the permanent injunction in this case on September 27, 1977. In my official capacity, I have the responsibility for the coal management activities of the Bureau of Land Management (BLM) subject only to the review and approval of these actions by the Secretary and Under Secretary. Under instructions from the Secretary no coal lease may be issued without his approval.

2. I am familiar with the effect of the September 27, 1977, injunction on the efforts of the Department of the Interior to prepare a new programmatic environmental impact statement and on its authority to conduct coal leasing activities under that order.

3. I have read the proposed modification of the Order which plaintiffs and federal defendants submitted on March 3, 1978, along with a Joint Motion under Rule 60(b) of the Federal Rules of Civil Procedure For An Order Approving Stipulation As An Appropriate Basis for Modification of the Permanent Injunction.

---

1. Plaintiffs, although favoring consolidation for reasons not difficult to imagine, nevertheless have previously argued that the issues in *Hughes* and *Berklund* are essentially different.

Plaintiffs' Response to Supplemental Memorandum of Intervenor-Defendant Utah Power, May 27, 1978, pp. 1–2.

4. Under the existing Court Order, the Department can issue coal leases only in narrow circumstances to existing mines and only for three years of reserves.

5. If the Court's injunction is modified as proposed in the Joint Motion, it would give the Department of the Interior the authority to issue coal leases in certain additional well-defined situations where the need for the coal is shown as described in greater detail below.

### I. General Provisions of Proposed Modification

6. Paragraph 1 of the proposed modification, if approved, would allow the Secretary to issue leases to maintain production and employment at mines existing on September 27, 1977, at the rate of production during the preceding year or at the rate of production needed to meet contracts in effect at that date. The Secretary could grant these leases for amounts of up to eight times the past annual production or annual contracts requirements. If this authority is not granted, the Secretary will be less able to prevent unemployment or to help supply legitimate coal needs, expressed by contractual commitments between two private parties. The eight-year standard will help to ensure that adequate financial arrangements can be made and that the production involved in a single lease is not so small as to prevent good design of mining and reclamation plans.

7. Paragraph 2 of the proposed modification, if approved, would give the Secretary the authority to prevent the irreparable loss of small tracts of federal coal reserves which should be mined as part of an ongoing mining operation. Because of coal ownership and reserve patterns, past federal coal leasing practices, and reclamation and other environmental concerns, the failure of the Department to issue a lease to an existing mining operation that could mine an unleased federal coal deposit as part of its ongoing operation may isolate that tract from other coal deposits. This isolation creating "by-passed" coal can make that tract too expensive, either economically or environmentally, to mine in the future. Potentially significant energy supplies which could have been mined with a minimal increment of environmental impact will be lost. Federal royalty receipts, part of which are passed on to the States in which the coal was mined, will also be lost.

8. Paragraphs 3 and 4 of the proposed modification, if approved, would make clear that the Order does not apply to actions which are authorized in certain situations under section 510(b)(5) or to take actions to accommodate the purpose of section 908 of the Surface Mining Control and Reclamation Act. The former provision permits the Secretary to issue leases to move coal mining from environmentally sensitive alluvial valley floors to less sensitive areas. The latter provision authorizes the Department of Energy to fund demonstration projects for improved mining techniques. If modified as proposed, the injunction would authorize the Secretary to issue leases necessary for those projects.

9. Paragraph 5 of the proposed modification if approved, provides that the Secretary may issue leases based on seven applications now pending before the Department. The seven new leases are included because each applicant has demonstrated a current need for coal that can be met from federal lands without restricting the Department's ability to analyze programmatic issues. It does not appear, for example, that any of these leases will require construction of major new transportation facilities. Major new transportation facilities have important environmental consequences because they may allow development of not only the lease in question, but also other undetermined leases. Further, the introduction of new transportation facilities into an area may well foster regional development and impacts of a secondary, non-mineral nature to an unknown degree. One of these seven lease applications is for a small underground deposit which would afford the only source of coal for local use in a rural area of Colorado. Another of these lease applications is for a lignite mine in Texas which would fuel an electric power

generation plant five miles away; the likely alternative sources of supply are mines in Montana and Wyoming.

10. The injunction, modified as proposed, would also allow the Department to prepare an environmental impact statement on competitive coal lease application W 50061. That application proposes a lease to supply coal for an electric utility in Illinois. Additional investigation is needed to resolve questions which can be best answered by the preparation of an impact statement on the proposal. These questions relate primarily to the availability of other sources of coal, particularly eastern coal.

11. The injunction, if modified as proposed, would also allow the federal defendants to examine all pending preference right lease applications to determine whether the applications were timely filed and meet other threshold criteria of Section 2(b) of the Mineral Leasing Act. On the other hand, because these determinations do not commit the federal defendants to grant the applications, these determinations would not commit the Secretary to any position which might be inconsistent with policy decisions he may make after consideration of the final programmatic environmental impact statement. Under the modified order a limited number of preference right lease applications could be fully processed. Because these applications cannot be granted and leases issued, federal defendants will not commit themselves by this processing to actions which might be inconsistent with policy decisions made after consideration of the final programmatic environmental impact statement. To help insure that the cumulative effects of these applications would not effect evaluation of programmatic issues, the applications to be selected are those under which mining would lead to the least environmental impact.

12. The injunction, if modified as proposed, would clarify that the federal defendants may continue to engage in general studies and general analyses, and may prepare national and regional environmental impact statements on federal coal leasing. The proposed modification would also clarify that the federal defendants may also continue comprehensive land use planning under the Federal Land Policy and Management Act of 1976, 90 Stat. 2743, a statutory responsibility which affects many activities other than coal.

## II. *Utah Power and Light Company*

13. According to certain information submitted to the Department by Utah Power and Light Company, entitled "Proposed Steam Electric Generating Plant Development Report" (November 5, 1976) in connection with the Regional Environmental Impact Statements for Central and Southern Utah, Utah Power and Light proposes a power system with three parts: (1) a coal mine which would use coal in the lands covered by its preference rights lease applications in Utah; (2) a 200-mile railroad; and (3) two coal-fired generating facilities. (Selected pages of this document are attached as shown below) [attachment omitted from publication].

14. As of 1976, this development was being planned to meet projected power demand for the period 1986 through 1991.

15. If the railroad is built, it would be used to deliver not only that coal mined from the lands covered by Utah Power and Light's lease applications, but also coal mined from other new mines on nearby lands. See attachment page 1–10 [attachment omitted from publication]. Utah Power and Light Company expects to produce more than seven million tons of coal annually from its mines alone. See attachment page 2–1 [attachment omitted from publication].

16. The railroad line will cross the Dixie National Forest and pass through varied terrain, characterized by buttes, mesas, cliffs, washes and steep canyons. See attachment page 1–12 [attachment omitted from publication]. The totally new construction portion of the railroad may require three bridges, and seven tunnels which may be almost three and one-half miles long. See attachment table 4–2 [attachment omitted from publication].

17. The environmental impact of such a railroad has not been fully evaluated.

18. The area of the proposed lease is now sparsely populated; the present land-uses are primarily grazing and recreational. See, attachment pages 3–18 and 3–19 [attachments omitted from publication]. The construction of the railroad and the start-up of large-scale coal mining in this area can be expected to have major social and economic impacts in the area.

19. The property covered by its applications is probably not the only source of coal available to meet the Company's power needs. Utah Power and Light itself has made an analysis of a number of alternatives to leasing of this federal coal which could be used to meet its projected power demands. See attachment pages 7–1, 7–2, 7–6, 7–14, 7–24, 7–35, 7–43, 7–53, 7–61 [attachments omitted from publication].

III. *Summary*

20. Prior to issuing ˙any of the leases that would be authorized under the proposed modification, the Department will for each of the applications comply with all of the requirements of the Mineral Leasing Act of 1920, as amended, the National Environmental Policy Act of 1969, and other pertinent statutes. Full and complete analysis of the facts concerning the involved leases must await those actions.

21. In my opinion the proposed modification of the injunction properly balances public interests in energy production with the protection of the environment until the programmatic impact statement is completed.

/s/ GUY MARTIN

Subscribed and sworn to before me this 3rd day of April, 1978.

/s/ Richard R. Lee
Notary Public

My commission expires April 14, 1982.