**UTAH INTERNATIONAL, INC., a Delaware Corporation, Plaintiff,**

v.

**Cecil D. ANDRUS, Secretary of the Interior; Curtis J. Berklund, Director, Bureau of Land Management, United States Department of the Interior; Vincent E. McKelvey, Director of the Geological Survey of the United States; Dale Andrus, State Director for the United States Bureau of Land Management in the State of Colorado; and J. Paul Storrs, Area Mining Supervisor, Conservation Division of the Geological Survey of the United States in the State of Colorado, Defendants.**

Civ. A. No. 77–K–595.

United States District Court, D. Colorado.

April 18, 1980.

Miles C. Cortez, Jr., Welborn, Dufford, Cook & Brown, Denver, Colo., for plaintiff.

Jerry B. Tompkins, Asst. U. S. Atty., Denver, Colo., Gerald S. Fish, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

The above-entitled action is another suit involving the federal coal leasing program which has undergone a great deal of change in the past ten years and has prompted a substantial amount of litigation. Plaintiff Utah International, Inc., seeks the issuance of a preference right coal lease for certain federal lands located in the Danforth Hills of northwestern Colorado where it began exploring for coal almost fifteen years ago. Because of the failure to issue such a lease upon a showing in 1970 that plaintiff had discovered coal in commercial quantities on these lands and the determination that plaintiff will have to meet certain new or additional requirements in order to obtain a lease, plaintiff has sued the Secretary of Interior, the Director of the Bureau of Land Management, and other federal land officials. Plaintiff seeks a declaratory judgment that a determination of the existence of coal in commercial quantities in the subject lands was made in 1970, that such determination vested in plaintiff a right to the issuance of a lease, and that such a lease should now issue; a declaratory judgment that policies and regulations promulgated after 1970 cannot be applied to require plaintiff to meet new or additional requirements in order to obtain a lease, or, if such policies and regulations would otherwise apply, then in the alternative that certain 1976 regulations are invalid as applied to plaintiff; and an order requiring the Secretary of the Interior and his authorized representatives to issue to plaintiff a preference right lease for the lands covered by Prospecting Permit No. C–0123475. The action is currently before the court on cross-motions for summary judgment.

Because the resolution of a preliminary question requires an understanding of the facts of this case, I will set out in this part of the opinion the material facts that are not in dispute. In their joint pretrial statement, the parties state the following uncontroverted facts:

1. Pursuant to Section 2(b) of the Mineral Leasing Act, as amended prior to August 4, 1976, 30 U.S.C. § 201(b), plaintiff's predecessor in interest applied for and received, effective February 1, 1965, a coal prospecting permit (identified as C–0123475), valid for a period of two years from the effective date, for certain lands in Ts. 4 N., Rs. 93 and 94 W., 6th P.M., Moffat County, Colorado, containing approximately 2,081.57 acres.

2. On or about November 1, 1965, the permit was assigned to plaintiff (formerly denominated as Utah Construction and Mining Company.)

3. Prior to expiration of the permit plaintiff applied for and received an extension thereof through January 31, 1969.

4. Prior to expiration of the extended life of the permit plaintiff applied for a preference right coal lease pursuant to 30 § U.S.C. § 201(b).

5. Plaintiff's lease application was rejected by the Colorado land office on May 2, 1969, whereupon plaintiff appealed to the Director of the Bureau of Land Management from such rejection.

6. On April 27, 1970, while plaintiff's appeal was pending, the Chief, Conservation Division, Geological Survey, acting on behalf of the Survey's Director, stated in a memorandum to the Chief, Branch of Mineral Appeals, Office of Appeals and Hearings, Bureau of Land Management, that plaintiff had 'established that coal in commercial quantities exists in the lands' covered by plaintiff's permit, and he recommended that 'the preference right lease be granted.'

7. By a decision of April 29, 1970, the Office of Appeals and Hearings, Bureau of Land Management, reversed the land office decision of May 2, 1969, on the basis of the Geological Survey's report of April 27, 1970, and remanded the case to the land office 'for further appropriate action looking toward issuance of the preference right coal lease requested.'

8. On or about February 17, 1973, the Secretary of the Interior issued a moratorium on all coal leasing except coal leases which met short-term criteria defined in the news release announcing the moratorium.

9. On or about January 26, 1976, the Secretary of the Interior adopted a new federal coal leasing policy including a restatement of short-term criteria which must be met before preference right coal leases would issue and including a new proposed definition of the term 'coal in commercial quantities.'

10. On May 7, 1976, the Secretary of the Interior published (at 41 F.R. 18847) regulation 43 C.F.R. § 3520.1–1 which, among other things, defined 'commercial quantities of coal.'

11. On or about July 25, 1977, in the case of *Natural Resources Defense Council v. Hughes* [454 F.Supp. 148], Civil Action No. 75–1749 (U.S.D.C., D.C.), the Department of the Interior, in a memorandum filed with the Court, changed its policy and indicated that preference right coal leases could be issued even where they do not conform to the short-term criteria so long as lease issuance would be in the 'public interest.'

12. On September 27, 1977, in the *Hughes* case, the United States District Court for the District of Columbia issued an order by which it enjoined officials of the Department of the Interior, pending the accomplishment of specified actions, from 'taking any steps whatsoever, directly or indirectly, to implement the new coal leasing program, including calling for nominations of tracts for federal coal leasing and issuing any coal leases, except when the proposed lease is required to maintain an existing mining operation at the present levels of production or is necessary to meet existing contracts and the extent of the proposed lease is not greater than is required to meet these two criteria for more than three years in the future.' [1]

---

1. Without deciding what impact it might otherwise have had on this litigation, the final environmental impact statement for the new federal coal leasing program was issued on April 30,

13. On July 5, 1977, plaintiff filed documents required to support a claim of an 'initial showing' of 'commercial quantities of coal' under regulation 43 C.F.R. 3521.-1–1(b) of May 7, 1976, at the same time expressly disclaiming any obligation to make the showing called for by the regulation.

14. To date no lease has been issued to plaintiff, nor has plaintiff's application been rejected.

(Joint Pretrial Statement, at 4–7, footnote added.)

■ The question presented is whether a decision by the Bureau of Land Management dated April 29, 1970, finding that plaintiff had discovered coal in commercial quantities in federal lands covered by Prospecting Permit No. C–0123475, vested in plaintiff a right to be issued a preference right coal lease, so that plaintiff cannot be required to meet new or additional requirements established after that decision. Jurisdiction is provided by 28 U.S.C. §§ 1331, 1361 and 2201–02. While the Administrative Procedure Act is not an independent basis for jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed. 192 (1977), it provides, in pertinent part, the applicable standards for review of federal agency action:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.    .    .    .    .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights;

.    .    .    .    .

5 U.S.C. § 706. I find that there are no material facts in dispute and that summary judgment is appropriate.

## II

■ A preliminary question is whether this matter is ripe for judicial decision. It is not the first time that the question has been raised. In the latter part of 1978, the parties previously made cross-motions for summary judgment, which motions were set for oral argument on January 24, 1979. The question of ripeness, or exhaustion of administrative remedies, was raised in defendants' memoranda of law and at oral argument. I said from the bench and later entered a written order that:

> It is beyond the authority of this Court at this time to order by mandamus that the defendants herein issue a specific lease; however, it is within the power of this Court to direct that defendants issue a decision which shall be a final administrative decision with respect to the plaintiff's pending application. *Citizens v. Volpe*, 401 U.S. 402 [, 91 S.Ct. 814, 28 L.Ed.2d 136] (1971); *Nader v. FCC*, 520 F.2d 182 [D.C.Cir.]; *Sloan v. U. S. Department of Agriculture*, 335 F.Supp. 816 ([D.C.] 1971); *Hoffman-LaRoche v. Weinberger*, 425 F.Supp. 890 [D.C.]; *International Union, et al. v. Arthurs*, 480 F.2d 603, 10th Cir. (1973).

Order of February 26, 1979, as amended, at 2. As part of this order, defendants were directed "to issue within 120 days from the date of this order a final administrative order with respect to plaintiff's application for a preference right lease," and all pro-

---

1979, and the Secretary reached a final decision on the program on June 2, 1979. As represented by defendants, "[t]his secretarial decision was the last step in the process required by the court's order in *Hughes*, . . . , and the injunction expired on that date." (Memorandum

of Points and Authorities in Support of Defendants' Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment and Alternative Motion to Set for Trial, Aug. 31, 1979, at 3.)

ceedings were stayed until that administrative decision was filed with the court. Defendants' motions to dismiss and for summary judgment were denied, and no ruling was made on plaintiff's motion for summary judgment.

The administrative decision was filed on April 30, 1979. The Secretary of the Interior, through his authorized representatives, said:

> I hold that the May 1976 regulations vacate any previous determination which may have been made by subordinates of the Department of the Interior on the issue of whether Utah International had made a showing of coal in commercial quantities for prospecting permit C–0123475 and that Utah International must satisfy the requirements for the May 1976 regulations in order to receive a lease. Utah International may attempt to show the existence of coal in commercial quantities discovered during the initial and extended term of its prospecting permit pursuant to the May 1976 regulations.

(Decision by the Department of the Interior, Utah International, C–0123475, April 25, 1979, at 29–30.) *Compare Natural Resources Defense Council v. Berklund*, 458 F.Supp. 925, 932 (D.D.C.1978) (final agency action).

Defendants concede that the important question of what regulations or practice plaintiff must comply with in order to obtain a lease is ripe for judicial decision.

> It should be clearly understood . . . that it is defendant's position that the question as to whether plaintiff is entitled to a lease on the basis of the 1970 determination of the Geological Survey is ripe for judicial review for the reason that a final agency determination has been made that the Survey's 1970 determination did not confer upon plaintiff the right to a lease. [Citation omitted.]

2. Defendants have repeatedly characterized the agency action in 1970 as nothing more than a finding by the Geological Survey that coal had been discovered in commercial quantities. That is not a correct characterization. Not

(Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment and Alternative Motion to Set for Trial, Aug. 31, 1979, at 13 n. 11.) Defendants nonetheless argue that

> the ultimate question of plaintiff's lease entitlement is not ripe for judicial review for the reasons that (a) no final agency determination has been made with respect to that question, (b) the determination as to whether a lease should be issued and, if so, what terms and conditions it should contain is 'a responsibility entailing a substantial measure of administrative expertise and discretion.' [Citation omitted.]

(*Id.*)

I observe, first of all, that the former question is the central one, and the other questions can be resolved only after we have an answer to this one. Defendants say that this former question is ripe for review because "a final agency determination has been made that the Survey's 1970 determination did not confer upon plaintiff the right to a lease," but that "the ultimate question of plaintiff's lease entitlement is not ripe . . . [because] . . . no final agency determination has been made with respect to that question." [2] If the first determination of the Secretary is reversed, the second one is certainly cast in a different light. That is precisely what this case is about.

Second, defendants cite a number of cases that they say stand for the proposition that plaintiff must continue to exhaust the administrative process in order to show that it is entitled to a lease. *See Utah International, Inc. v. Andrus*, 488 F.Supp. 962 (D. Utah 1979); *Global Exploration & Development Corp. v. Andrus*, No. 78–0642 (D. D.C. Aug. 14, 1978); and *Kerr-McGhee Chemical Corp. v. Andrus*, No. 76–0608 (D. D.C.), *rev'd per curiam*, 574 F.2d 637 (D.C.Cir.

only was there a Geological Survey recommendation, but a formal agency adjudication that commercial quantities of coal had been discovered, and a remand for further appropriate action.

1978), *cert. denied,* 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). All of these cases address the situation where applications for leases or other sorts of permits were pending without any agency decision having been reached at the time of some moratorium or other delay in the administrative process. The proposition that the cases properly stand for is well-summarized in a recent decision from the Tenth Circuit. In *Hunter v. Morton,* 529 F.2d 645, 648–49 (10th Cir. 1976), the court expressly addressed the situation where pending applications for coal prospecting permits had been administratively rejected.

In *Hannifin v. Morton,* 444 F.2d 200 (10th Cir.), we . . . considered the retroactive application of a rental fee on lands in prospecting permits applied for before such fee was announced. We there said: 'We are of the opinion that the plaintiff and the members of the class had not acquired any vested right which would preclude subjecting them to the operation of the regulation.' [Citations omitted.] In *Hannifin v. Morton,* we also said: " . . . To hold otherwise, and to thereby recognize that the *mere filing of an application* creates a property right which is immune from modification, would seriously handicap the Secretary in the exercise of his proprietary duties."

(Emphasis added.)

While this concerns the merits of the case, the critical difference between the cases cited and the case at bar—and a difference that defendants make too little of— is that in the former cases there was only the filing of an application which was in process at the time of some moratorium or change in policy, while in the instant case there had been an agency determination some substantial time before any such moratorium or change. The difference is well-illustrated by comparing the situation in *Utah International, Inc. v. Andrus,* 488 F.Supp. 962, No. C 77–0225 (D. Utah June 15, 1979) with the situation here. In *Utah International,* the United States Geological Survey had made a determination that plaintiff, regarding another prospecting permit, had discovered coal in commercial

quantities, but there had been no decision by the Bureau of Land Management that Utah International was therefore entitled to a lease. The determination by the USGS was an important, even critical, input to the leasing decision process, but it was not itself a decision by the responsible agency. Here there was not only a USGS recommendation, but a formal agency adjudication by the Office of Appeals and Hearings, dated April 29, 1970, deciding that plaintiff had discovered coal in commercial quantities and remanding the file to the land office "for further appropriate action looking toward issuance of the preference right coal lease requested." The line drawn in the Utah district court's decision and this one is the line between pending applications that have been filed but not acted upon and applications that have been acted upon and decided. Such a line should be clear even to the myopic and give some sense of finality to the administrative process generally.

In sum, because of a final agency decision on the central question of this case, a finding that the cases cited by defendants are not applicable to the situation here, and a delay of ten years since the agency determination of April 29, 1970, I find that this action is cloyingly ripe for judicial decision.

### III

The history of the events and changes in the federal coal leasing program since the early 1970's has been set forth in detail in a number of cases. *See, e. g., Hunter v. Morton,* 529 F.2d 645 (10th Cir. 1976); *Peabody Coal Co. v. Andrus,* 477 F.Supp. 120 (D.Wyo.1979); *Natural Resources Defense Council v. Berklund,* 458 F.Supp. 925 (D.D.C.1978), *aff'd,* 609 F.2d 553 (D.C.Cir.1979); *Natural Resources Defense Council v. Hughes,* 437 F.Supp. 981 (D.D.C.1977), *amended order upon remand on motion of parties,* 454 F.Supp. 148 (D.D.C.1978). While some knowledge of this background is helpful to an overall understanding of this case, I will not endeavor to repeat all of it here.

Prior to its extensive amendment in 1976, Section 2(b) of the Mineral Leasing Act of 1920, 30 U.S.C. § 201(b), provided as follows:

Where prospecting or exploratory work is necessary to determine the existence or workability of coal deposits in any unclaimed, undeveloped area, the Secretary of the Interior *may issue*, to applicants qualified under this chapter, *prospecting permits* for a term of two years, for not exceeding five thousand one hundred and twenty acres; and if within said period of two years thereafter the permittee shows to the Secretary that the land contains coal in commercial quantities, the permittee *shall be entitled to a lease* under this chapter for all or part of the land in his permit.

Any coal prospecting permit issued under this section and section 202 of this title may be extended by the Secretary for a period of two years, if he shall find that the permittee has been unable, with the exercise of reasonable diligence, to determine the existence or workability of coal deposits in the area covered by the permit and desires to prosecute further prospecting or exploration, or for other reasons in the opinion of the Secretary warranting such extension.

(Emphasis added.) [3] In *Natural Resources Defense Council v. Berklund*, the district court summarized more than 50 years of agency practice under these provisions:

. . . Section 201(b) authorizes the Secretary [of the Interior] to issue prospecting permits and so-called 'preference right' leases where prospecting or exploration is necessary to determine the existence of coal. *The Department of the Interior, throughout the 58 years of administration of these provisions, has con-*sistently interpreted § 201(b) as giving the Secretary discretion in the granting of the prospecting permits, but as denying him discretion to reject a preference right lease once a permit has issued and coal in commercial quantities has been found.

Although the Secretary retained discretion in the granting of prospecting permits, until 1969 permits were issued routinely upon request where consistent with the law. Upon receipt of an application for a coal prospecting permit, the Bureau of Land Management (BLM) referred it to the United States Geological Survey (USGS), the agency responsible for making the geologic, economic and other technical judgment, for a determination whether sufficient information was known about the area to warrant offering the area for a competitive lease sale. If the USGS determined that sufficient information was not available, it notified the BLM that issuance of a prospecting permit was appropriate. Environmental consequences of issuing these permits were not examined or considered.

After the prospecting permit was issued, and if the permittee submitted an application for a preference right lease, the BLM again referred the lease application to USGS for a determination of whether the permittee had demonstrated that the land contained commercial quantities of coal. Determination of commercial quantities was based solely on whether the coal existed, its character and heat-giving quality, and whether it could be physically extracted at a profit without regard to environment impact or costs.[4] *Consistent with defendants' interpretation of § 201(b), if the USGS determined that commercial quantities of coal had*

---

**3.** The coal leasing provisions of the Mineral Leasing Act were extensively amended and the prior scheme in § 201(b) repealed, "subject to valid existing rights," in 1976, when Congress enacted the Federal Coal Leasing Amendments Act of 1975, Pub.L. 94–377, 90 Stat. 1085 (1976).

**4.** The fundamental reform in the 1976 regulations was to change the definition of "coal in commercial quantities" from one focusing solely on the quality and workability of the discovered coal to one that, in addition, internalized the environmental costs of its extraction and subsequent reclamation. *See* 43 C.F.R., Parts 3520 and 3521 (1976); *NRDC v. Berklund*, 458 F.Supp. 925, 930–31 (D.D.C.1978), *aff'd*, 609 F.2d 553 (D.C.Cir.1979).

*been found, the lease was issued automatically to the applicant.* The lessee could then extract the federal coal deposits specified in the lease pursuant to applicable laws, regulations and stipulations in the lease itself.

458 F.Supp. at 929 (footnote omitted; emphasis added). *Accord, Peabody Coal Co. v. Andrus,* 477 F.Supp. at 121, 123; *Natural Resources Defense Council v. Hughes,* 437 F.Supp. at 983–84.[5]

Upon a thorough review of the Mineral Leasing Act, the district court in *NRDC v. Berklund* noted that under the provisions pertaining to coal leases, "the Secretary exercises discretion and considers the public interest prior to issuing prospecting permits," and not at the time of determining whether the holder of a permit has discovered coal in commercial quantities. *Id.* at 935. The court then stated:

. . . *Udall v. Tallman, supra,* requires this Court to respect an agency's interpretation of its statutory discretion. [Citation omitted.] Since the enactment of the Mineral Leasing Act in 1920, the Department has never wavered in its interpretation of the mandatory language of § 201(b).

Given the unequivocal statutory language and the supporting legislative history, as well as 58 years of consistent agency statutory interpretation and application, the court finds that 'shall' does

in fact mean 'shall' and does not permit the Secretary to reject preference right leases on purely environmental grounds.

: . . The Court . . . finds nothing ambiguous in the words 'shall be entitled'; the language is a clear mandate to the Secretary to award a preference right lease to a permittee who has made the requisite statutory showing. *Id.*[6]

The court of appeals in *NRDC v. Berklund* affirmed. In its opinion, the court said:

The only condition that the permittee must meet to obtain a lease is to establish the presence of 'commercial quantities' of coal. The Act provides that a permittee meeting this condition 'shall be entitled to a lease under this chapter for all or part of the land in his permit.' This language is unequivocal and clear, and compels our conclusion *that the applicant who satisfies the condition is entitled to a lease.*

. . . . .

. . . [P]etitioners claim that the Secretary's discretion can be inferred from the term 'preference right lease,' assigned in the legislative history to leases under § 201(b). The meaning of the term is, in fact, ambiguous. Not used in the statute, nor defined in the House

---

5. In *Peabody Coal Co. v. Andrus,* 477 F.Supp. 120, 121 (D.Wyo.1979), the district court said:

Prior to the year 1972, permits to prospect for coal and extensions of these permits were granted pro forma almost without exception by the Department of Interior. Many of these prospecting permits ripened into preference right leases and it was the policy of the Interior Department to award such leases when commercial quantities of coal were discovered on the public lands.

It is now beyond cavil that a reasonable administrative construction given to a statute by an agency charged with its administration is entitled to substantial weight, especially when such construction was contemporaneous with the statute's enactment and expresses long-standing agency practice. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *American Petroleum Institute v. Environmental Protection Agency,* 540 F.2d

1023 (10th Cir. 1976); and *Marathon Oil Co. v. Andrus,* 452 F.Supp. 548 (D.Wyo.1978).

6. The Department's Office of the Solicitor has reached the same conclusion. In a March 25, 1975 memorandum from that office to Deputy Under Secretary Lyons, it was stated:

Neither BLM nor USGS have ever considered that the Department had any discretion as to lease issuance, if USGS had determined that coal in commercial quantities was present. . . . [Lease] provisions [relating to the environment] . . . have been inserted in leases after it was determined a permit holder was entitled to a lease, and the cost of complying with such provisions was never taken into account in making that determination.

(Brief in Support of Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment and for Summary Judgment, Sept. 22, 1978, Exhibit 10, at 4.)

Report, the term has, however, been construed by the agency consistently for nearly 60 years to mean *an automatic entitlement of a prospecting permittee who establishes the presence of commercial quantities of coal* in the area covered by the permit. This interpretation has not been disturbed by Congress or the courts, and it influences our conclusion here.

*NRDC v. Berklund,* 609 F.2d at 557–58 (footnotes omitted; emphasis added).

█ It is clear, then, that the only prerequisite to the issuance of a preference right lease was an agency determination that the holder of a prospecting permit had discovered coal in commercial quantities. Once that determination was made by the BLM, generally on the basis of a USGS report, the Secretary had no discretion to deny the issuance of a lease.[7] In the present case, the BLM had made this determination in April, 1970, under the then-existing definition of "commercial quantities" and according to long-established agency practice. Utah International's application for a preference right coal lease was no longer "pending" in the sense of awaiting a determination of its entitlement to a lease, and the government was not at liberty some three to six years later to revoke its earlier determination and apply some new and different policy, however more enlightened or obscured that new policy might be.[8]

Defendants argue that the Secretary of the Interior retains broad, continuing authority to reconsider decisions concerning the public lands until such time that a grant or some other formal disposition is actually issued, citing a number of Supreme Court decisions dated near the turn of this century. *See, e. g., Michigan Land and Lumber Co. v. Rust,* 168 U.S. 589, 592–95, 18 S.Ct. 208, 209–10, 42 L.Ed. 591 (1897); *Orchard v. Alexander,* 157 U.S. 372, 383–84, 15 S.Ct. 635, 639, 39 L.Ed. 737 (1895); and *Knight v. United States Land Association,* 142 U.S. 161, 176–82, 12 S.Ct. 258, 262–64, 35 L.Ed. 974 (1891). In *Knight,* a prior survey of land had been found to have been improperly conducted and was set aside by the Secretary. A second survey was ordered performed, and, on the basis of this second survey, a patent was issued. Among other matters that were raised in a subsequent lawsuit was a challenge to the authority of the Secretary to set aside the earlier survey. On reaching the Supreme Court, the Secretary's authority was upheld. In its opinion, the court quoted from the Secretary's decision:

"The statutes in placing the whole business of the Department under the supervision of the Secretary, invest him with authority to review, reverse, amend, annul or affirm all proceedings in the Department having for their ultimate object to secure the alienation of any portion of

---

7. While the present case concerns a determination of "commercial quantities" according to agency practice in 1970, the Department of the Interior apparently continues to hold to the same view that once that determination is made, the Secretary has no discretion to deny the issuance of a lease. *See NRDC v. Berklund,* 458 F.Supp. at 925. What has changed is the definition of "commercial quantities."

I note that the Federal Coal Leasing Amendments Act of 1975 was intended in part to remedy the situation in which the holder of a prospecting permit was almost automatically entitled to a preference right lease. The Act repealed § 201(b), "subject to valid existing rights," Section 4, Pub.L. 94–377, 90 Stat. 1085 (1976) "and in turn provide[d] for the issuance of exploration licenses, which do not give the licensee any right to the subsequent issuance of a coal mining lease." *NRDC v. Berklund,* 458 F.Supp. at 930 n. 8.

8. In its review of the Mineral Leasing Act, the district court in *NRDC v. Berklund* examined the legislative history of § 201(b) and quoted from a congressional report:

> . . . The House Report states that § 201(b) was intended:
>
> "to encourage the prospecting of undiscovered coal deposits and to reward the prospector *by giving him a preferential right to a lease of the area covered by his permit.*"

H.R.No.398, 66th Cong., 1st Sess. 12 (1919). 458 F.Supp. at 934. I think it's relevant to the question here, given this legislative purpose, that it was plaintiff who discovered the existence of coal in the land in question and I assume that it is plaintiff who should be rewarded accordingly. That does not mean, of course, that plaintiff thereby obtained an unbounded right to mine the coal in any manner that it pleased. *See* part IV, *infra.*

the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties. . . . When proceedings affecting titles to lands are before the Department the power of supervision may be exercised by the Secretary, whether these proceedings are called to his attention by formal notice or by appeal. It is sufficient that they are brought to his notice. The rules prescribed are designed to facilitate the Department in the dispatch of business, not to defeat the supervision of the Secretary. For example, if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly-ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the Attorney General to institute proceedings for its annulment, it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the Attorney General to take measures to annul. . . ."

142 U.S. at 178, 12 S.Ct. at 262–263. The court itself said, in a frequently quoted passage:

> The Secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted or is disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of public lands.

*Id.* at 181, 12 S.Ct. at 264.

In a more recent case, *Boesche v. Udall*, 373 U.S. 472, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963), the Supreme Court cited these earlier decisions and recognized the general authority of the Secretary:

> We think that the Secretary, under his general powers of management over the

public lands, had authority to cancel this [oil and gas] lease administratively *for invalidity at its inception*, unless such authority was withdrawn by the Mineral Leasing Act. . . .

> The Secretary has . . . long been held to possess the same authority with respect to other kinds of interests in public lands: . . . *Orchard v. Alexander*, 157 U.S. 372 [, 15 S.Ct. 635, 39 L.Ed. 737] . . . ; *Knight v. United States Land Assn.*, 142 U.S. 161 [, 12 S.Ct. 258, 35 L.Ed. 974] . . .

. . . . .

> . . . Since the Secretary's connection with the land continues to subsist, he should have the power, in a proper case *to correct his own errors*.

373 U.S. at 476–78, 83 S.Ct. at 1376–1377 (emphasis added). The Tenth Circuit has also recognized the proposition established by these cases. In *Morrow v. Clayton*, 326 F.2d 36 (10th Cir. 1964), the question was raised whether the Secretary of Agriculture had authority to refuse to approve or to cancel certain fraudulent transfers of cotton acreage allotments, where the county committee had determined that the applications for transfer were proper and had recommended that they be approved. The court of appeals said at 45–46:

> As a general proposition of administrative law, the head of an administrative agency has the power to review and revise acts of subordinates where, as here, the powers in question are vested in the subordinate under the supervision and direction of the superior or the power to administer is vested in the superior. *Knight v. United [States] Land Association*, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 . . .

. . . . .

> . . . Unless he does have this authority the Secretary is not equipped to meet his responsibilities. This conclusion finds support in the recent case of *Boesche v. Udall*, 373 U.S. 472 [, 83 S.Ct. 1373, 10 L.Ed.2d 491], where the Supreme Court held that the Secretary of Interior had administrative authority to cancel oil

and gas leases on public lands for invalidity at their inception, i. e., for fraud. *Accord, Ideal Basic Industries, Inc. v. Morton,* 542 F.2d 1364 (9th Cir. 1976); *Reed v. Morton,* 480 F.2d 634 (9th Cir. 1973).

■ While it is established law that the Secretary of the Interior has supervisory authority over the disposition of the public lands, subject to pertinent provisions of administrative and substantive law, these cases do not apply to the situation here. The sort of continuing authority which they illustrate has to do with the Secretary's ability to deal with error or fraud in the administrative process, and not his ability to apply changes in policy determinations already made. As the court of appeals said in *Chapman v. El Paso Natural Gas Co.,* 204 F.2d 46, 53–54 (D.C.Cir.1953):

> It may well be appropriate for a licensing authority to reopen proceedings of this kind after final determination has been made in order to correct clerical errors or to modify rulings on the basis of newly discovered or supervening facts, but a decision may not be repudiated for the sole purpose of applying some . . . change in administrative policy.

In the present case there is no allegation of error in the factual determination of 1970 or in the application of 1970 agency practice. Nor is there any allegation of fraud. Accordingly, the determination must stand.

The controversy here has not centered on legislative changes in federal coal leasing policy, as evidenced in the Federal Coal Leasing Amendments Act of 1975, but I note that the revision of § 201(b) was expressly "subject to valid existing rights." Section 4, Pub.L. 94–377, 90 Stat. 1085 (1976). The Senate Committee on Interior and Insular Affairs, in S.Rep.No.94–296, 94th Cong., 1st Sess. 15 (1975), said:

The Committee wishes to stress that the repeal of Subsection 2(b) [30 U.S.C. § 201(b)] is expressly "subject to valid existing rights" and thus is not intended to affect any valid prospecting permit outstanding at the time of enactment of the amendments. Any applications for preference right leases based on such permits could be adjudicated on their merits . . . if the requirements of Subsection 2(b) of the 1920 Act . . . were met.

■ The federal district court in Wyoming discussed this preservation of existing rights in *American Nuclear Corp. v. Andrus,* 434 F.Supp. 1035 (D.Wyo.1977), and held that "[a]n application for a coal prospecting permit is simply not the kind of valid existing right that was contemplated" by Congress. *Id.* at 1037. That holding is clearly consistent with *Kerr-McGhee Chemical Corp. v. Andrus* and the other cases discussed in part II of this opinion. The court based its holding on the fact that, as discussed above, the Secretary does have discretion to either accept or reject an application for a prospecting permit, contrasting this with the situation in *Stockley v. United States,* 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1922), where the Supreme Court recognized that the Secretary had no discretion to grant or deny a patent once an entryman had fulfilled the statutory requirements of the Homestead Act. The case here is much more similar to *Stockley,* since it is clear that the Secretary had no discretion to deny Utah International a lease once Utah International had fulfilled the statutory requirements of the Mineral Leasing Act of 1920, as administered by defendants.[9] By the express terms of the statute, Utah International had made the required showing of coal in commercial quantities, and was entitled to a lease. Accordingly, I hold that Utah International

---

9. Defendants have made much of a moratorium placed on coal leasing in the early 1970's, which began informally sometime in 1971 and was publicly announced only in February 1973. While the holding here does not in any way depend on the validity or affect of that moratorium, I note that Secretarial Order No. 2952, which announced the moratorium, "did not

purport to affect permits previously issued and expressly provided that nothing therein should 'be deemed to restrict the rights of holders of prospecting permits issued prior to this directive to obtain preference right coal leases under section 2(b).' " *Peabody Coal Co. v. Andrus,* 477 F.Supp. at 121. *Accord, NRDC v. Berklund,* 458 F.Supp. at 930.

obtained a vested right in a preference right coal lease on the April 29, 1970 date of the BLM decision and that regulations promulgated subsequent to that date cannot be applied to preclude that right. Defendants have unlawfully withheld the issuance of plaintiff's lease and the decision to apply subsequent regulations to that lease is not legally tolerable.

## IV

The holding above establishes the right of Utah International to obtain a lease based on the showing of coal in commercial quantities in 1970. It should be clear that this holding does not preclude the Secretary from endeavoring to protect the environment or excuse Utah International from compliance with applicable environmental laws. The parties admit as much. Defendants concede that plaintiff is not seeking "a lease granting an untrammeled right to mine coal in any manner it chooses and without regard for the effect its operations might have upon the rights of others." (Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, Aug. 10, 1978, at 15.) Plaintiff likewise acknowledges "that even after obtaining the preference right mining lease it must comply with all applicable environmental and reclamation laws, both state and federal, before it can turn a shovel full of dirt on the ground." (Brief in Support of Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment and for Summary Judgment, Sept. 22, 1978, at 18–19.)

Under the applicable provisions of the Mineral Leasing Act of 1920, 30 U.S.C. § 187, the Secretary has express authority to establish lease terms that protect a number of important interests.

> Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill and care in the operation of said property; a provision that such rules for the safety and welfare of the miners and for the prevention of undue waste as may be prescribed by said Secretary shall be observed, . . .

and such other provisions as [the Secretary] may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare.

Upon its becoming law on January 1, 1970, the Secretary was also required to administer the Mineral Leasing Act in accordance with the important policies of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq. The statute expressly states at 42 U.S.C. § 4332 that, "to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, . . ." while the district court in NRDC v. Berklund held that NEPA did not create discretion to deny the issuance of a lease, it said that "it does direct [the Secretary] to exercise his authority to safeguard society and prevent irreparable damage to the environment through a careful and complete formulation of lease terms." 458 F.Supp. at 937.

Finally, it is also clear that regulations promulgated by the Department of the Interior on January 19, 1969 are applicable to plaintiff's lease. See 43 C.F.R., Part 23 (1973). These regulations require a technical examination prior to the issuance of a lease in order to formulate lease provisions, as well as approval of a mining plan prior to any actual mining operations. See NRDC v. Berklund, 458 F.Supp. at 929–30. Plaintiff has recognized the applicability of these regulations in noting that "[t]he Reclamation Act can and will be complied with at the mining plan approval stage." (Plaintiff's Reply Memorandum and Brief in Response to Defendants' Opposition Reply, Nov. 22, 1978, at 9.)

It is not within the judicial province to establish the actual terms of the lease to be issued plaintiff. That role lies with defendants. Accordingly, it is

ORDERED that plaintiff's motion for summary judgment be and hereby is granted, and that defendants' motion for summary judgment be and hereby is denied. It is further

ORDERED that plaintiff is entitled to a preference right coal lease based on the Bureau of Land Management decision dated April 29, 1970, regarding the lands covered by Prospecting Permit No. C–0123475, and that defendants issue such coal lease on such terms and provisions as the Secretary shall deem appropriate according to the laws and regulations discussed in part IV above. It is further

ORDERED that such lease be issued without any further delay except as necessary to meet applicable provisions of the laws and regulations discussed in part IV above and to establish appropriate lease terms. It is further

ORDERED that each party shall bear his or its own costs.